[Civ. No. 35326. Second Dist., Div. Two. July 8, 1970.]

LOS ANGELES FREE PRESS, INC., Plaintiff and Appellant, v. CITY OF LOS ANGELES et al., Defendants and Respondents.

COUNSEL

Mitchell S. Shapiro and Richard E. Posell for Plaintiff and Appellant.

Roger Arnebergh, City Attorney, George J. Franscell, Assistant City Attorney, Louis H. DeHaas, Jr., John T. Neville, Lowell M. Ramseyer, Deputy City Attorneys, John D. Maharg, County Counsel, Robert C. Lynch, Assistant County Counsel, and Michael H. Dougherty, Deputy County Counsel, for Defendants and Respondents.

## OPINION

**FLEMING, J.**—Petitioner, The Los Angeles Free Press, Inc. (Free Press) appeals a judgment denying a writ of mandate and an injunction to require respondents—the City of Los Angeles, the Los Angeles Chief of Police, the County of Los Angeles, and the Los Angeles County Sheriff—to issue press identification cards to Free Press reporters. The trial court's findings of fact and conclusions of law disclose the nature of the cause:

"I

"Petitioner is a California corporation with its principal place of business in the City of Los Angeles, County of Los Angeles, State of California. It publishes a weekly paper, The Los Angeles Free Press (hereinafter called the 'Free Press'), which has a circulation of over 85,000 copies each week and employes eight full-time reporters and photographers, in addition to others who report for the paper on a part-time basis. The Free Press has qualified as a second-class publication for mailing purposes.

"II

"On or about January, 1967, Petitioner applied to both the Los Angeles Police Department and the Los Angeles County Sheriff's Department for issuance of press identification cards (hereinafter called 'Press Passes') to qualified reporters of the Free Press. No application for Press Passes was made by Petitioner directly to the County of Los Angeles, acting through its Board of Supervisors.

"III

"The City of Los Angeles Board of Police Commissioners is authorized by Section 52.16 through 52.20 of the Los Angeles Municipal Code to issue Press Passes to qualified applicants. There is no Los Angeles County ordinance applicable to the issuance of Press Passes but the Sheriff of Los Angeles County, in the exercise of his discretion, does issue Press Passes to qualified applicants. The County of Los Angeles, acting through its Board of Supervisors, does not accept applications for, or issue Press Passes, or order the granting or denial of such credentials to any person.

"IV

"Press Passes are used by reporters and other representatives of daily and non-daily newspapers, news services, radio stations, television stations and networks to cross police lines and enter areas closed to the general public and thus provide access to information at certain locations, as for example, the scene of crimes, fires or natural disasters and press conferences by policing authorities, where such access is denied to the public generally. The local demand for such Press Passes is substantial, the Los Angeles Police Department currently issuing approximately 1800 each year and the Sheriff of Los Angeles County issuing approximately 3,000 each year.

"V

"The number of Press Passes issued by Respondents is now restricted,

the purpose of such restriction being to protect the public safety, health and welfare and to contribute to the efficient performance of policing duties. Respondents' present restrictive policy in issuing Press Passes originated in the chaos which accompanied a major train wreck in this area several years ago when rescue operations were seriously impeded by the presence of too many authorized onlookers at the scene of the accident.

## "VI

"When an application for a Press Pass is received by the Los Angeles Police Department or by the Los Angeles County Sheriff's Department, an investigation is made by the department to which such application is made to determine whether such an identification card is needed in connection with the applicant's regular course of business in gathering and distributing spot police-beat and fire news. The basic standard of eligibility for Press Passes imposed by each of the Respondents necessitates therefore, some review of the work product of the applicant—whether it be a news service, newspaper, other publication, radio or television station or network to ascertain if it is in fact regularly engaged in gathering and distributing (through publication, broadcasting, telecasting, etc.) of such spot news. Each of the Respondents has refused and continues to refuse Press Passes to free-lance and part-time reporters, representatives of specialized publications such as trade papers, theatrical or financial papers, college newspapers and members of the news media generally who perform functions other than those directly connected with the regular gathering and distribution of hard core news generated through police and fireman activities.

## "VII

"After eligibility of an applicant has been established, Press Passes are issued by each of the Respondents directly to the reporters, cameramen, technicians and other employees of such applicant who have been appropriately screened to avoid issuance of such credentials to any person with a criminal background. Press Passes are thus issued only to individuals and not to the corporations or other entities engaged in the gathering and distribution of news by whom such individuals may be employed.

## "VIII

"Each of the Respondents, in the exercise of discretion, denied Petitioner's application for Press Passes for Petitioner's designated employees on the ground that a need therefor was lacking because Petitioner's publication, the Free Press, is not regularly engaged in the gathering and reporting of spot, hard core police-beat and fire news. The exercise of such

discretion by each of the Respondents was premised on their respective findings that Petitioner is instead engaged in publishing materials primarily consisting of feature articles with some essay-type reports having to do with events, current and past, such as riots, demonstrations, assassinations, news conferences, et cetera, where the reporting of such events is focused largely on sociological considerations.

"IX

"Twenty separate editions of the Free Press (ten copies selected by Petitioner and ten copies selected by Respondents) introduced into evidence pursuant to a stipulation that such evidence serve the limited purpose of reflecting the paper's editorial content and format, establish that such editions carried no then current regular hard core police-beat or fire news as such; and that the news coverage of such issues was pointed toward sociological problems existing in our society. Other evidence introduced at trial supports a finding that the emphasis of the Free Press is not on crime news between individuals and that from its inception the Free Press was designed to report news of civil riots, peace demonstrations, and 'conflicts between the individual and the state.'

"CONCLUSIONS OF LAW

"I

"Petitioner is a proper party to this proceeding and has no plain, speedy or adequate remedy at law.

"II

"In this mandamus proceeding this court may construe the constitutional provisions relied upon by Petitioner in order to ascertain whether any duty allegedly owed to Petitioner by Respondents may be enforced.

"III

"Petitioner, as a news gatherer, has no constitutionally protected right of access to information which is not freely accessible to the public generally.

"IV

"The denial by each of Respondents of Petitioner's application for Press Passes did not abridge Petitioner's right to either freedom of speech or freedom of the press and did not constitute a prior restraint under the First or Fourteenth Amendments of the United States Constitution or under Article I, Section 9 of the California Constitution.

## "V

"The denial by each of Respondents of Petitioner's application for Press Passes did not arbitrarily discriminate against Petitioner in violation of its right to due process under either the United States Constitution or the Constitution of the State of California.

## "VI

"The denial by each of Respondents of Petitioner's application for Press Passes did not arbitrarily discriminate against Petitioner in violation of its right to equal protection of the law under either the Constitution of the United States or the Constitution of the State of California. There is no constitutional requirement that Respondent show uniform treatment to all publications or news media in issuing Press Passes, the only requirement being that there be a reasonable basis for the classification imposed. The standards of eligibility for Press Passes imposed, respectively, by Respondents are fair and reasonable in the circumstances and do not constitute an unreasonable classification.

## "VII

"The classification governing eligibility for Press Passes which each of Respondents has imposed does not constitute censorship or restriction upon the expression of ideas.

## "VIII

"The issuance of Press Passes by each of Respondents is a legitimate exercise of the police power inherent in government and the equal protection clauses of the United States and California Constitutions do not limit the legitimate exercise of the police power.

## "IX

"The petition for writ of mandamus filed by Petitioner herein alleges that Petitioner's application for Press Passes has been unlawfully denied in violation of the provisions of Section 52.16 of the Los Angeles Municipal Code and, inasmuch as Petitioner thus asserts duties owed to him under such Code, Petitioner is precluded in this proceeding from questioning the constitutionality of such Code.

## "X

"Each of the Respondents in denying Press Passes to Petitioner's employees was acting within areas of discretion legally authorized and the exercise of such discretion by each of the Respondents was not abused.

## "XI

"None of the Respondents, in refusing Press Passes to Petitioner's employees, acted arbitrarily, capriciously or fraudulently. . . ."

*Police Power.* Petitioner does not contend that peace officers in the furtherance of public order and safety cannot reasonably restrict the number of persons crossing police lines at the scene of a crime or disaster. Nor does petitioner contend that the sheriff and the Los Angeles Chief of Police have set up police lines and denied the general public full access to newsworthy events at times when public order and safety did not call for such restrictions. (Even if such a contention had been made it would be of doubtful relevance, for here petitioner seeks to obtain a priority of access superior to that of the general public.) Rather petitioner contends that its liberty has been arbitrarily restricted and it has been denied equal protection and due process of law by the adoption and operation of a restrictive policy which violates the First and Fourteenth Amendments to the United States Constitution.

■ *First Amendment.* Does petitioner's status as the publisher of a weekly paper give petitioner under the First Amendment a right of access to the scenes of crimes and disasters superior to that of the general public? The answer, derived from a multitude of cases, is a clear *no,* and the trial court so held. (*Worthy* v. *Herter* (1959) 270 F.2d 905, 907-909 [106 App. D.C. 153]; *Tribune Review Co.* v. *Thomas* (3d Cir. 1958) 254 F.2d 883; *Trimble* v. *Johnston* (D.C. 1959) 173 F.Supp. 651, 655-656; *United Press Associations* v. *Valente* (1954) 308 N.Y. 71 [123 N.E.2d 777]; *State* v. *Buchanan* (1968) 250 Ore. 244 [436 P.2d 729]; *New York Post Corp.* v. *Moses* (1960) 23 Misc.2d 826 [204 N.Y.S.2d 44, 53-56]; *Kirstowsky* v. *Superior Court,* 143 Cal.App.2d 745, 754-755 [300 P.2d 163].) Restrictions on the right of access to particular places at particular times are consistent with other reasonable restrictions on liberty based upon the police power, and these restrictions remain valid even though the ability of the press to gather news and express views on a particular subject may be incidentally hampered. (*Zemel* v. *Rusk,* 381 U.S. 1, 16-17 [14 L.Ed.2d 179, 189-191, 85 S.Ct. 1271]; *Cox* v. *New Hampshire,* 312 U.S. 569 [85 L.Ed. 1049, 61 S.Ct. 762, 133 A.L.R. 1396]; *Garland* v. *Torre* (2d Cir. 1958) 259 F.2d 545, 548-549.)

■ *Fourteenth Amendment—Equal Protection.* If restrictions imposed on the public by the use of police lines do not deprive members of the public of their liberty without due process of law, and if petitioner, despite its press status, has no greater right to cross police lines than other members of the public, has petitioner nevertheless been denied equal protection of the laws by the operation of a policy which grants priority to

cross police lines to those members of the press who regularly report police and fire news? We think not. Because of the necessity in terms of public order and safety to restrict access to certain events, respondents could either deny the right to cross police lines to all members of the public, or they could distinguish between members on some reasonable basis. Regular coverage of police and fire news provides a reasonable basis for classification of persons who seek the privilege of crossing police lines. It is true, as petitioner points out that, respondents could have defined the class of persons to be given priority in crossing police lines by some other standard. Indeed, respondents probably could have granted the privilege of crossing police lines on a first-come-first-served basis. However, the issue under the equal protection clause of the Fourteenth Amendment is whether the classification upon which the unequal treatment rests is a reasonable one. ■ The equal protection clause "[does] not prevent classification . . . [or] require [uniform treatment] . . . with respect to persons or things which are in fact different." (*County of Los Angeles* v. *Southern Cal. Tel. Co.,* 32 Cal.2d 378, 388-389 [196 P.2d 773].) "A classification is reasonable . . . if there are differences between the classes and the differences are reasonably related to the purpose of the [government in providing differing treatment]." (*Werner* v. *Southern Cal. etc. Newspapers,* 35 Cal.2d 121, 131 [216 P.2d 825, 13 A.L.R.2d 252].) ■ Here, the purpose of granting priority to some to cross police lines is to allow the public to gain information about crimes, fires, disasters, and the like, without jeopardizing public order and safety in the process. This purpose is served by a classification of members of the public into those who regularly report such events in the public media and those who do not and by a grant of priority to those who so report. The classification is a reasonable one for constitutional purposes, even though other classifications might have achieved the same result.

Cases relied upon by petitioner to support its argument that it has been denied equal protection of the laws, *Wirta* v. *Alameda-Contra Costa Transit Dist.,* 68 Cal.2d 51 [64 Cal.Rptr. 430, 434 P.2d 982]; *Danskin* v. *San Diego Unified School Dist.,* 28 Cal.2d 536 [171 P.2d 885]; and *Hillside Community Church, Inc.* v. *City of Tacoma* (1969) 76 Wn.2d 63 [455 P.2d 350], are inapposite for two reasons: first, they involve limitations on advertising or public meetings in instances where the need for such limitations had not been shown; second, the limitations were connected with the content of the ideas to be advertised or to be discussed. Here, the distinction between petitioner's employees and the recipients of press passes was not based on the ideas expressed in their reporting but rather

on the need to cross police lines in the regular course of their business, a need which the trial court found less pressing for petitioner's employees than for recipients of press passes. We find sufficient evidence in the record to support the trial court's view that respondents issued press passes to those who reported police and fire events with some regularity, and respondents did not base their actions on the content of such reportage.

■ *Fourteenth Amendment—Due Process.* Petitioner contends that it was denied due process of law because the power to issue press passes had not been delegated by law to the Sheriff of Los Angeles County, and because there were no legally determined guidelines for the issuance of such passes. But in seeking a writ of mandate petitioner has tacitly recognized the sheriff's authority to issue press passes. (Code Civ. Proc., § 1085.) Additionally, the argument lacks persuasiveness because the sheriff has a duty imposed by sattute to enforce the laws of the state and maintain public order and safety, and such duty implicited carries the authority to limit public access to certain events. (See Gov. Code, §§ 26600, 26602, 26620 et seq. and Pen. Code, § 409.5.) Clearly, the sheriff has discretion to permit or not permit certain persons to cross police lines, and the record before us fails to establish that he exercised his dscretion unreasonably.

Petitioner makes the same argument about the lack of legislatively determined guidelines for the issuance of press passes by respondent Los Angeles Chief of Police. Section 52.16(A) of the Los Angeles Municipal Code declares that the Board of Police Commissioners is authorized to issue press passes to press representatives of daily newspapers or news services. Section 52.17 of the Los Angeles Municipal Code gives the Board reasonable discretion to limit the number of press passes and to deny press passes. Here again, the record fails to establish that in denying press passes to petitioner's employees the chief of police exercised his discretion unreasonably or in violation of the Municipal Code.

*Fourteenth Amendment—Arbitrary Discrimination.* ■ As a final argument petitioner contends that even if the standards for press passes were reasonable, they were arbitrarily and discriminatorily applied against petitioner's interest because of its editorial policy. (*Yick Wo* v. *Hopkins,* 118 U.S. 356, 373-374 [30 L.Ed. 220, 227-228, 6 S.Ct. 1064].) Essentially, this argument raises an issue of fact. The trial court found that respondents did in fact issue press passes on the basis of whether the

applicant was a person who regularly covered police and fire news, and there is sufficient evidence in the record to sustain that finding.

The judgment is affirmed.

Roth, P. J., and Herndon, J., concurred.

A petition for a rehearing was denied July 28, 1970, and appellant's petition for a hearing by the Supreme Court was denied September 30, 1970. Wright, C. J., did not participate therein.