**Clarke R. WATSON, Plaintiff,**

v.

**Daniel P. CRONIN, Manager of Safety of the City and County of Denver, State of Colorado, et al., Defendants.**

**Civ. A. No. C-5119.**

United States District Court,
D. Colorado.

Oct. 31, 1974.

---

Clifford L. Neuman, Taussig & Cobb, Boulder, Colo., Robert Plotkin, National Legal Aid and Defender Association, Washington, D. C., for plaintiff.

William J. Chisholm, Gerald Himelgren, Asst. City Attys., Denver, Colo., for defendant Daniel P. Cronin and the City and County of Denver.

William E. Russell, Denver, Colo., for defendant Colorado Press Ass'n.

## MEMORANDUM OPINION AND ORDER

FINESILVER, District Judge.

The plaintiff, Clarke R. Watson, brought this action pursuant to 42 U.S. C. § 1983 and 28 U.S.C. §§ 1343(3), 2201, and 2202 alleging deprivation under color of state law of his constitutional rights. Plaintiff challenges the denial to him of a press card by the Denver Manager of Safety and the Colorado Press Association. Plaintiff has advanced several constitutional grounds in support of his complaint: namely,

deprivation of First Amendment rights to freedom of the press, Fifth and Fourteenth Amendment rights to due process of law and equal protection of the law and Eighth Amendment rights to be free from cruel and unusual punishment. Plaintiff also alleges that there has been improper delegation of authority by the state legislature to the Manager of Safety and by him to the Colorado Press Association, a private association, without standards or guidelines limiting discretion. Plaintiff seeks a declaratory judgment, an injunction, and monetary relief.

We conclude that the plaintiff has failed to establish a cause of action under § 1983 or under any constitutional provision which would entitle him to the relief sought; also, we find the actions of the Manager of Safety proper in denial of the issuance of the press card.

## FACTS

Plaintiff is a 32 year old male with some experience and interest in journalism. In June of 1972, he was employed by Thomas Publications in Denver as National Affairs Editor for Key Magazine, a monthly publication. In this position, Plaintiff reported news of political interest. In July of 1972 Plaintiff applied for a press card with the Colorado Press Association, a private organization which acts as a forwarding agent for the Denver Manager of Safety and the Colorado State Patrol who endorse the cards to be issued. Press cards enable the bearer to go behind police and fire lines in order to better report "on the spot" occurrences. The cards also allow reporters access to the floors of the state legislative bodies and to some police files which are not available to the public. Press cards entitle the bearers to special license tags and parking privileges.

Plaintiff was notified in October, 1972, by a letter from Daniel P. Cronin, Manager of Safety for Denver, that his application for a press card had been denied. The letter states:

"Your application for a press card has been denied by this office because of your arrest record. It is the policy of this office to deny a press card to anyone with a felony conviction." *Plaintiff's Exhibit #2.*

Plaintiff was not afforded a hearing before the Manager of Safety in regard to this matter.

## FELONY CONVICTIONS

The evidence in the case shows that in July, 1964, the Plaintiff pled guilty to a forgery charge in Boulder, Colorado. As a result of this conviction, Plaintiff served thirty-seven months in the Colorado State Penitentiary. He was released in November, 1968.

In February, 1972, Plaintiff was arrested and charged with aggravated robbery and conspiracy to commit robbery of the cashier of the Denver Zoo. These charges were pending at the time Plaintiff made his application for a press card. On September 26, 1973, in Denver District Court, Plaintiff entered a plea of guilty to simple robbery—a felony—in connection with this charge. Plaintiff testified that he was granted probation for this offense by the Denver District Court. Records of the Denver District Court for November 1, 1973, reflect the following:

" . . . [D]efendant entered a plea of Guilty TO COUNT THREE: SIMPLE ROBBERY ORDER: PROBATION BE DENIED. COUNTS ONE AND TWO BE DISMISSED ON COURT ORDER:

"NOW THEREFORE, the Court being fully advised in the premises, it is the Judgment and Sentence of the Court that the defendant, CLARK [sic] REED WATSON be confined to the Colorado State Reformatory at Buena Vista, Colorado, for an indeterminate term NOT TO EXCEED THIRTEEN (13) YEARS, TIME SPENT IN CUSTODY AWAITING DISPOSITION TAKEN INTO CONSIDERATION.

FURTHER ORDER: THAT EXECUTION OF SAID SENTENCE IS HEREBY SUSPENDED ON TERMS AND CONDITIONS THAT DEFENDANT SUCCESSFULLY COMPLETE NINETY (90) DAYS ON DENVER COUNTY JAIL WORK RELEASE PROGRAM AND UNDER SUPERVISION OF THE PROBATION DEPARTMENT."

Thus, at time of trial Plaintiff had felony convictions in July of 1964 and September 26, 1973. He made application for the press card in July 1972.

## PLAINTIFF'S TESTIMONY

Plaintiff testified to only two occasions after October, 1972 when he was in need of a press card to gain admittance to an event he was reporting. He stated that he did not lose his job with Thomas Publications because he was unable to obtain a press card; in fact, as he testified, he continued his employment until April of 1974. It is also important to note that in August, 1972, Mr. Watson was promoted to the position of Managing Editor of Key Magazine and Executive Editor of the Colorado Pollution Control Journal also published by Thomas Publications. He retained these positions throughout his employment by Thomas even though he did not possess a press card.

Plaintiff testified that he voluntarily left Thomas Publications in April, 1974, because he felt his lack of a press card was a hinderance to the company in that he had to supervise employees who had press cards. Plaintiff testified that he did not suffer any monetary loss or reduction in salary as a result of his inability to obtain a card; in fact, he received a salary increase when he was promoted.

Plaintiff also testified that he applied for a job as a reporter with a daily Denver newspaper after he left Thomas Publications in 1974. In the interview for the job, Plaintiff testified that the previous conviction was discussed but that the primary reason he did not obtain employment with the newspaper was that the paper was not in need of a new employee at that time. At trial, a representative of that paper testified that one factor which is considered in an employment application is the presence or lack of a press card.

## DENVER MANAGER OF SAFETY'S TESTIMONY

Mr. Daniel P. Cronin is currently the Manager of Safety for Denver and has been in that position for three years. Before that time, he was employed by the Denver Fire Department for thirty-four years serving as Chief of that department for two years.

Mr. Cronin's testimony agreed with that of the Plaintiff's as to occurrence and chronology of the events. However, Mr. Cronin testified at trial that he does not have a blanket policy automatically excluding convicted felons from consideration for a press pass. Mr. Cronin testified that Mr. Watson's application was the first one to his knowledge that his office has received from an ex-offender; that there are approximately 1200 cards in existence; that his policy now is to determine issuance of press credentials on the basis of an applicant's background; and that a person's arrest record subsequent to a felony conviction is a consideration in his determination. Mr. Cronin testified further that in his opinion a period of five years without arrest following a felony conviction is indicative of rehabilitation, and that he would generally issue a card to such a person.

Mr. Cronin testified that persons with press cards are admitted to sensitive areas and to police files to which the general public is not allowed access. He also testified that in his opinion only trustworthy persons should be afforded the privilege of going behind police and fire lines. When he was considering Mr. Watson's application, it was brought to his attention that Mr. Watson might have some criminal involvement. An investigation was conducted at which time Mr. Cronin learned that Mr. Watson had been previously convicted of a felony

and that he currently had a felony charge of aggravated robbery pending against him. Mr. Cronin also reviewed Plaintiff's three-page arrest record and his alleged involvement in unrest on the campus of the University of Colorado. After considering this information and reviewing developments in the robbery charge, issuance of a press card was denied by Mr. Cronin.

Mr. Cronin also testified that his office is presently reviewing the arrest status of all press card holders in order to consider their qualifications to hold press cards. This procedure will be followed annually.

## LEGAL ISSUES

On the facts as established in this case, Plaintiff has failed to demonstrate the denial to him of any constitutionally protected rights nor has he demonstrated any injury to himself or his employment as a journalist by the actions of the defendants in this matter. Our analysis of the constitutional contentions follows:

## FIRST AMENDMENT ARGUMENT

 We are not in agreement with Plaintiff's contention that this case involves First Amendment rights to freedom of speech or of the press. A reporter does not have an absolute unqualified right of access to news. Branzburg v. Hayes, 408 U.S. 665, 682–684, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972); Zemel v. Rusk, 381 U.S. 1, 17, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965). State authorities may place reasonable limitations on the right of access to press credentials. E. g., Los Angeles Free Press, Inc. v. City of Los Angeles, 9 Cal.App. 3d 448, 88 Cal.Rptr. 605 (Ct.App. 1970), cert. denied, 401 U.S. 982, 91 S.Ct. 1193, 28 L.Ed.2d 334 (1971). Plaintiff has not shown in any way that his freedom of speech or the press has been infringed.

 Plaintiff cites two recent cases in support of his argument that this case involves a denial of First Amendment rights. We have considered those cases and conclude that they are not applicable to the facts as established here. In Consumers Union of United States, Inc. v. Periodical Correspondents' Association, 365 F.Supp. 18 (D.D.C. 1973), the Court held that a Congressional rule as interpreted by the Periodical Correspondents' Association which limited the access of certain publications to the U. S. Senate and House galleries violated the First Amendment rights of the plaintiff, Consumers Union. In that case, certain established correspondents implemented arbitrary regulations to exclude representatives of other publications from the galleries without guidance or limitation from the Congress. That case is significantly distinguishable from the facts of this case as the Court emphasized that a free press is undermined if access to newsworthy facts is denied to certain publications because they advocate a particular viewpoint. Such a situation is not presented by the facts of this case where Mr. Watson's individual press card was denied after an investigation into his criminal record.

Plaintiffs have also cited Lewis v. Baxley, 368 F.Supp. 768 (M.D.Ala. 1973) which construed and held unconstitutional a state ethics statute that required all members of the press to submit a statement of economic interest before they would be allowed to cover legislative events. Lewis held that the press must be afforded access to events and information to which the general public has access. Id. at 775. The case is clearly distinguishable from the present situation involving, as it did, a severe limitation on the ability of all reporters to publish information for the public on any state legislative activity.

We also believe this case to be significantly different from Borreca v. Fasi, 369 F.Supp. 906 (D.Haw. 1974). The Court held there that the Honolulu Mayor's personal action in barring a certain reporter from attending any news conferences entitled the reporter to a preliminary injunction. The Mayor's action was based on his dislike for the manner

in which that reporter and his newspaper reported the Mayor's activities. The Court felt that such intimidation or manipulation of press coverage violated the First Amendment.

In the present case, an individual's application for a press card was denied because of his criminal record and a pending felony charge. Mr. Watson's First Amendment rights were not violated by this action. He was in an executive position with his magazine, his major responsibilities were editorial, and there was no showing that his personal journalistic work was hampered in any way by the denial of his application for a press card.

Other authorities relied upon by Plaintiff are distinguishable from this case as they involve arbitrary denial of licenses or permits to publicly demonstrate or make speeches.

## DUE PROCESS

Plaintiff argues that his constitutional right to due process of law, both substantively and procedurally, has been violated by defendants' denial of his application.

He contends that the Department's policy creates an impermissible presumption against ex-offenders. However, as noted, Mr. Cronin stated that his office does not automatically deny an application received from an ex-offender; rather, such an application calls for the institution of an investigation into the applicant's rehabilitation and worthiness to obtain special press privileges.

We conclude that Plaintiff has not demonstrated in this case that there is an impermissible presumption against ex-offenders by the Manager of Safety's office in issuing press cards. The facts of this case do not bring it within the purview of those cases which have found impermissible presumptions to be violative of due process. *E. g.,* Cleveland Board of Education v. LaFleur, 414 U.S. 632, 94 S.Ct. 791, 39 L.

Ed.2d 52 (1974); Vlandis v. Kline, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973); United States Dept. of Agriculture v. Murry, 413 U.S. 508, 93 S.Ct. 2832, 37 L.Ed.2d 767 (1973); Heiner v. Donnan, 285 U.S. 312, 52 S.Ct. 358, 76 L.Ed. 772 (1932); Schware v. Board of Bar Examiners, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957); Pordum v. Board of Regents, 491 F.2d 1281 (2d Cir. 1974).

The Plaintiff has also failed to demonstrate that Mr. Cronin exercised his discretion unreasonably. In this case, there was a rational basis, as explained by Mr. Cronin, for the denial of the press card. It is not irrational for the Manager of Safety to consider the fact that an applicant has an aggravated felony charge pending against him at the time he applies for a card or that he has had a felony conviction in the past.

As to the procedural due process argument, Plaintiff contends that he should be afforded a hearing by the Manager of Safety before his application may be denied. While Plaintiff was not given a hearing by the Manager's office prior to the denial of his application, he was clearly informed of the reasons for the denial.

A hearing procedure in the determination of the propriety of issuance of press cards may be advisable; however, we do not believe it is constitutionally mandated especially in the case before us. It was not necessary for Mr. Watson to obtain a press card in order to continue in his chosen profession of journalism as was true in cases such as Schware v. Board of Bar Examiners, *supra,* involving a license to practice law. *See* Butts v. Nichols, 381 F.Supp. 573, (S.D.Iowa 1974). Nor is this a situation involving a substantial loss of liberty or property as was true in cases such as Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.

2d 287 (1970); Sniadach v. Family Finance Corporation, 395 U.S. 337, 89 S. Ct. 1820, 23 L.Ed.2d 349 (1969).

A hearing would have been a useless act considering that Plaintiff had been convicted of a felony and was under charge of aggravated robbery during this period. These were matters clearly known to Plaintiff. The action of the Manager of Safety in denying a press card to Plaintiff was clearly proper and did not constitute an abuse of discretion or a violation of Plaintiff's due process rights. Plaintiff has not been denied "life, liberty, or property" without due process of law.

## EQUAL PROTECTION CONTENTIONS

 Plaintiff also argues that he has been denied equal protection of the law in that there is no compelling state interest or rational basis for the Manager's policy of excluding the broad class of ex-offenders from those entitled to press cards. While Mr. Cronin's letter to Mr. Watson indicated that this was the policy of his office, Mr. Cronin testified at trial that, in fact, his office does not have a blanket policy against issuance of press cards to ex-offenders. Rather, he now institutes an investigation into the background and criminal record of any convicted felons who apply. Does this policy satisfy the requirements of equal protection? We hold that it does.

We conclude that the test to be used for this determination is whether the city can demonstrate a rational basis for any difference in treatment of ex-offenders from others who apply for a press card. This case does not involve a fundamental right or suspect classification such as to require the state to demonstrate a compelling interest in the classification. The only possible basis for suspect classification is that of a classification based on a criminal record. However, such a classification has not as yet been held suspect. *See* Upshaw v.

McNamara, 435 F.2d 1188, 1190 (1st Cir. 1970); Butts v. Nichols, *supra, See generally* Note, Developments in the Law—Equal Protection, 82 Harv.L.Rev. 1065 (1969).

The fundamental rights which Plaintiff alleges are involved here are First Amendment rights or a right to employment. As noted, we do not believe that there was any denial of First Amendment rights. The right to employment has not as yet been held to be a fundamental right such as to invoke the compelling state interest test. The two recent cases cited by Plaintiff, Sugarman v. Dougall, 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973) and In re Griffiths, 413 U.S. 717, 93 S.Ct. 2851, 37 L. Ed.2d 910 (1973) are distinguishable as they involved state legislation specifically restricting employment opportunitites to aliens, a classification which has been held suspect. *E. g.* Takahashi v. Fish and Game Commission, 334 U.S. 410, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948).

The distinction between ex-offenders and others seeking press passes is not based on the content of the ideas to be discussed in the reporting, but on the need to insure that those given special privileges in reporting and gathering news can be trusted not to abuse those privileges.

The Plaintiff places great reliance on the recent case of Butts v. Nichols, *supra,* which held that state legislation prohibiting the employment of convicted felons in civil service positions in Iowa violated the equal protection clause. That case is not helpful. *Butts* was concerned with a specific state statutory scheme which *absolutely* precluded ex-offenders from obtaining certain *public employment.*

## CRUEL AND UNUSUAL PUNISHMENT

 This case does not fall within the constitutional prohibitions of the Eighth Amendment against cruel and

unusual punishment. We are mindful of cases which have applied the constitutional concept of cruel and unusual punishment to restrictions on ex-offenders after their release from jail. *E. g.,* Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958); Weems v. United States, 217 U.S. 349, 30 S.Ct. 544, 54 L. Ed. 793 (1910). However, these cases dealt with statutes denying fundamental rights to ex-offenders. Here the Plaintiff has not demonstrated denial of fundamental or constitutional rights.

## UNLAWFUL DELEGATION OF AUTHORITY ARGUMENT

The last basis for relief suggested by Plaintiff alleges impermissible delegation of authority to the Manager of Safety and the Colorado Press Association in issuance of the press cards. Plaintiff's claim relates to the lack of any definite standards established by the legislature or the Manager of Safety's office in regard to qualifications necessary to obtain a press card.

■ The duties of the Manager of Safety are set forth in Article IX of the Charter of the City and County of Denver. While these duties do not relate specifically to the issuance of press cards, we believe they are adequate to satisfy constitutional standards. The Manager has a duty imposed by the Charter to enforce the laws of the State of Colorado and to maintain public order under the Constitution. Such duties carry an implicit authority to limit access to certain events particularly when these events involve activities behind police and fire lines. The Plaintiff has not demonstrated that in denying him a press card the Manager exercised his discretion unreasonably or in violation of the Denver Charter. This case does not involve the unfettered discretion of an official in denying a permit to demonstrate or speak publicly in violation of First Amendment rights. *E. g.,* Staub v. Baxley, 355 U.S. 313, 78 S.Ct. 277, 2 L.Ed.2d 302 (1958); Kunz v. New York,

340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951).

■ The evidence indicates that the Colorado Press Association acts only as a conduit to accept applications and prepare the press cards to be sent to the Manager of Safety. The Manager himself is the sole authority in the issuance or denial of the cards. We conclude that no impermissible delegation of authority to the Colorado Press Association has been established.

■ Though we are not granting declaratory relief in this regard, we comment further on the over-all policy of issuance of press cards. As was evident at the trial of this matter, the qualifications and procedures necessary to obtain a press card are nowhere delineated clearly or set out in writing. In the past, this procedure has been carried out in a rather perfunctory manner without providing applicants any suggestions as to what qualifications they must possess in order to obtain press credentials and without a consistent inquiry into these applications. We strongly suggest to the Manager of Safety that the policy of his office in regard to such qualifications and procedures be established by means of written regulations or outlines, and the role, if any, of the Colorado Press Association in channeling applications be spelled out.

## CONCLUSIONS

We are sympathetic to the rights of ex-offenders in their struggle to rejoin society in a meaningful way and to obtain gainful employment according to their abilities. We are aware of the great deal of judicial interest and legislative activity in this area recently and also the large amount of high level research being done. An excellent treatise in this emerging field is Kerper and Kerper, Legal Rights of the Convicted (West Pub. 1974) particularly chapters I, II, and XV. *See e. g.* American Bar Association, Laws, Licenses, and The Offender's Right to Work (Washington,

D. C.: National Clearing House on Offender Employment Restrictions, 1973); President's Commission on Law Enforcement and The Administration of Justice, Task Force Report: Corrections (Washington, D. C.: U. S. Government Printing Office, 1967); Bromberger, Rehabilitation and Occupational Licensing: A Conflict of Interests, 13 Wm. & Mary L.Rev. 794 (1972); Portnoy, Employment of Former Criminals, 55 Cornell L.Rev. 306 (1970); Note, Due Process Limitations on Occupational Licensing, 59 Va.L.Rev. 1097 (1973; Note, The Need for Reform of Ex-Felon Disenfranchisement, 83 YaleL.J. 580 (1974). (1974).

■ Indeed, the Colorado legislature itself has indicated that the strong public policy of this state is to aid ex-offenders in their rehabilitation to society and to insure that they are not discriminated against solely because they, at one time, were convicted of crimes. Chap. 151 § 39–25–101, 1973 Colo.Sess.Laws Vol. 1, p. 513.

We hold only that on the unique facts of this case, the Plaintiff has failed to demonstrate that he has been denied any constitutional rights by virtue of the denial to him of a press card. He has failed to establish his cause of action on any ground.

Accordingly, we hold that Plaintiff's claims do not reach constitutional dimensions in any regard, that Plaintiff is not entitled to relief under 42 U.S.C. § 1983, and that defendants are not liable in this matter under any constitutional provisions. The issues are found in favor of the Defendants and each of them and against Plaintiff.

Therefore, it is ordered that judgment shall be entered in favor of the Defendants and each of them and against the Plaintiff. Defendants shall recover their costs.

This opinion contains and shall constitute the findings of fact and conclusions of law required by Rule 52, Fed.R.Civ.P.