[No. D002910. Fourth Dist., Div. One. Aug. 6, 1986.]

STEVEN LEISERSON, Plaintiff and Appellant, v.
CITY OF SAN DIEGO et al., Defendants and Respondents.

42

COUNSEL

Ronald W. Hutcherson for Plaintiff and Appellant.

John W. Witt, City Attorney, Ronald L. Johnson, Senior Chief Deputy City Attorney, Eugene P. Gordon, Chief Deputy City Attorney, and Leslie J. Girard, Deputy City Attorney, for Defendants and Respondents.

OPINION

WIENER, J.—Plaintiff Steven Leiserson appeals the judgment in favor of defendants, the City of San Diego and one of its police officers. At issue is the applicability of Penal Code section 409.5, subdivision (d),[1] which

---

[1]All statutory references are to the Penal Code unless otherwise indicated. For convenience later references to statutory subparts will omit repetition of the word "subdivision."

limits the authorization given to law enforcement and other designated government officials under subdivision (a) of that same section to cordon off and close a disaster area to the general public.[2] The statutory limitation prevents law enforcement from interfering with any member of the news media who wishes to enter the closed area. The statute represents the Legislature's effort to strike a balance between the right of the press to gather important news and the obligation of police and fire personnel to respond quickly and effectively to major disasters. Although we discuss the interesting questions presented by the statute, we rest our decision on the mundane. We decide substantial evidence supports the trial court's finding that law enforcement reasonably believed that the disaster site was also the scene of a possible crime and accordingly section 409.5, subdivision (d), did not apply to guarantee Leiserson access to the crime scene. We therefore affirm the judgment.

### Factual and Procedural Background

On September 25, 1978, at approximately 9 a.m., a Pacific Southwest Airlines jetliner collided in mid-air with a small private plane and crashed in a residential section of central San Diego, killing all on board and a number of persons on the ground.[3] Leiserson was employed as a television news cameraman by KFMB-TV Channel 8 at the time. On the morning of September 25, he was instructed to drive to the scene of the crash to film the emergency operations. Arriving between 9:15 and 9:20, Leiserson spent approximately the next 30 minutes moving about the crash site shooting video tape.

Defendant Frederick Edwards, a police officer employed by the City of San Diego, was patrolling near the crash site on the morning of the 25th.

---

[2]Section 409.5 provides in relevant part as follows:

"(a) Whenever a menace to the public health or safety is created by a calamity such as flood, storm, fire, earthquake, explosion, accident or other disaster, . . . [peace] officers . . . may close the area where the menace exists for the duration thereof by means of ropes, markers or guards to any and all persons not authorized by such officer to enter or remain within the closed area. . . .

". . . . . . . . . . . . . . . . . . . . . . .

"(d) Nothing in this section shall prevent a duly authorized representative of any news service, newspaper, or radio or television station or network from entering the areas closed pursuant to this section."

[3]A map of the area surrounding the crash site, which was an exhibit in the trial court, is reproduced as an appendix to this opinion. The elliptical area in the center of the map roughly corresponds to the debris pattern resulting from the crash. The plane initially impacted near the northeast corner of Dwight and Nile Streets. It then slid down Dwight Street and into several houses on the south side of the street where it exploded. Of the nine houses located in the area bounded by Nile, Dwight and Boundary Streets and the concrete walkway which parallels Dwight, eight were partially or totally destroyed. In addition, three of the four houses on the north side of Dwight also suffered significant damage.

Officer Edwards arrived at the site within minutes of the crash and helped several people escape damaged or burning houses. He then positioned himself at the intersection of Dwight and Nile Streets, near the eastern edge of the crash site, in an effort to keep spectators away from the area in which emergency crews were operating. Sergeant William Capps arrived within 15 minutes to supervise the police operations at the site. He instructed Edwards to keep back all nonemergency personnel.

Approximately a half-hour after he arrived, Leiserson was filming the wreckage from a point on Dwight Street just west of Nile when he was approached by Officer Edwards. Edwards instructed Leiserson to leave the immediate crash site and directed him to an area on the east side of Nile Street where a number of spectators were standing. According to Edwards, he told Leiserson the area was dangerous because of downed power lines. Leiserson responded that he had a right to be in the area filming and requested Edwards' badge number. He then moved away from Edwards in the general direction Edwards had pointed but stopped behind the house on the southwest corner of Dwight and Nile. Officer Edwards again approached and directed that Leiserson continue moving away from the crash site. He threatened to arrest Leiserson if he failed to comply. Leiserson then continued down Nile Street a short distance to a paved walkway which parallels Dwight Street. The walkway roughly marked the southern edge of the crash site. At the entrance to the walkway on Nile, Leiserson encountered Howard Blunt, a retired private security guard who had volunteered to help police with crowd control. Blunt had been instructed by Edwards to keep nonemergency personnel from using the walkway. Blunt told Leiserson he could not enter the walkway but Leiserson ignored the warning and pushed past him.

When Edwards was informed by another officer that Leiserson had proceeded down the walkway, the two officers followed and arrested him for failing to comply with the lawful order of a police officer. (§ 148.2, subd. 2.) Edwards took Leiserson to a police command post established a short distance from the crash site and later booked him in county jail. He was released within several hours.[4]

Edwards admitted recognizing Leiserson as a member of the press but explained that he did not distinguish between press and nonpress persons in terms of excluding them from the immediate crash site. The only bases articulated by Edwards for excluding Leiserson were the orders he had received from Sergeant Capps and his concern for Leiserson's safety. He

---

[4]Leiserson's complaint alleges that a misdemeanor criminal complaint was filed against him but was dismissed by the municipal court in the interests of justice.

specifically testified he did not recall having seen Leiserson pick up or touch anything or in any way disturb the crash site.

Sergeant Capps testified that shortly after he arrived, he established a cordoned-off area for members of the press near the northwest corner of Boundary and Dwight Streets approximately 50 to 60 feet from the crash site. This area was closer to the site than the general public was allowed but was considered by Sergeant Capps to be safe for nonemergency personnel. Leiserson, however, was never informed by Edwards or anyone else of the existence of the designated press area.

Capps also testified that he had not been at the scene very long when he was approached by two California Highway Patrol (CHP) officers who told him they understood that California Lieutenant Governor Mervyn Dymally had been a passenger aboard the plane and that threats had recently been made on his life. They believed the crash may have been caused by a bomb explosion. Capps testified he never saw either CHP officer before or after the incident nor did he receive any additional information suggesting that the crash was anything other than an accident. Officer Edwards was never told of the CHP officers' story and testified that he never received any information indicating that the plane crash might have been the result of a criminal offense.[5]

The case was heard by the trial court sitting without a jury. Based on Leiserson's earlier request for a statement of decision, Judge Carter filed an "Intended Decision" in which he explained his conclusion that Edwards acted properly in ordering Leiserson away from the crash site and in later arresting him when he failed to comply with that order. In his view, Edwards and Capps reasonably believed the crash site might constitute the scene of a crime—from which members of the press have traditionally been excluded. The judge also felt that the right of press access guaranteed by section 409.5(d) did not extend to situations where the police officer reasonably believes that members of the press would be endangered by entering the disaster area. He further noted that press access sufficient to comply with the statute had been afforded by Sergeant Capps' designation of a cordoned-off press area within 60 feet of the crash site. Judgment was then proposed to be entered in favor of defendants.[6]

---

[5] As it turns out, the CHP officers' story was untrue.

[6] The relevant portion of Judge Carter's written decision states as follows:

"The Court finds under the circumstances of this case that the purpose of the activities undertaken by Officer Edwards, and the authority conferred to him pursuant to § 148.2, subdivision 2, of the Penal Code was not designed solely to penalize, control or limit free speech or press rights in gathering news for dissemination, but rather was undertaken to carry out his lawful duties and was only exercised after admonishing the plaintiff to remain out of an area which was then dangerous to human life, and was then the scene of an

Leiserson filed a number of specific objections to the "Intended Decision." A hearing on those objections was commenced by Judge Carter but was never completed. The continued hearing was scheduled to resume in three weeks. In the interim Judge Carter died. Defendants then moved under Code of Civil Procedure section 635 to have judgment entered by Judge Duffy, acting presiding judge of the superior court, in conformity with Judge Carter's "Intended Decision." Defendants represented to the court that during the first part of the hearing which occurred before it was continued, Judge Carter indicated "his decision would remain the same" although he

---

uninvestigated possible crime area.

"Secondly, it seems significant to observe that at least from the case law cited and which this Court has been able to find in research, clearly indicates that historically members of the press and news media have not been allowed to enter into crime designated areas until completion of criminal investigations.

"Third, considering the time, place and manner of the application of § 148.2 of the Penal Code by Officer Edwards, his orders to the plaintiff were clearly given at a time when it may reasonably be said that the cordoned off disaster area was dangerous to human life and at a time when it simply would not have been reasonable to have permitted, in addition to the plaintiff, some sixty other members of the then present news media to proceed to trample over the crash site in an uncontrolled and unrestricted way.

"In addition, it seems to this Court that if a police officer has a duty to protect and preserve human life, it requires a little logic to note that had the plaintiff been seriously injured by reason of an explosion, fire or downed high voltage line, the defendant Edwards and the City of San Diego may well have found themselves exposed to a civil liability suit for wrongful death or personal injuries because of an alleged breach of that duty and failure to warn plaintiff to keep out of the dangerous area.

"Finally, it should be noted that the news media were not denied unreasonable [sic] access to the disaster site but instead were specifically permitted to assemble within an area sixty feet from the doomed jetliner and its 150 victims, whereas the general public was restrained over two blocks in all directions from the crash site. Thus, there was no attempt by governmental authority to determine what news might be gathered in a newsworthy context but rather to provide to all of the then present news media an equal opportunity to select and choose what material they then deemed significant for their own purposes from a location that did not unreasonably restrict the accomplishment of that activity under the circumstances presented. Here only the plaintiff sought to violate the cooperative efforts offered by the police then on duty.

"Accordingly, this Court concludes that under the circumstances Officer Edwards acted properly in ordering the plaintiff to stay out of the cordoned dangerous and then designated crime area and that after two warnings the failure of the plaintiff to obey such lawful order and return to the restricted area, fully justified Officer Edwards in placing the plaintiff under arrest as provided in § 148.2, subdivision 2, of the Penal Code. It is a general rule of construction that statutes which relate to the same subject are to be construed together and harmonized so as to uphold both of them if reasonably possible. *County of Placer* v. *Aetna Casualty and Surety Company*, 50 Cal.2d 182. This Court perceives that both Penal Code § 148.2 and § 409.5 can be read so as to permit media personnel to go beyond a place cordoned when the general public is excluded, but the media personnel are required to obey lawful police orders once inside the cordoned area where such order relates to a reasonably justified conclusion that the excluded area inside the cordoned area is then dangerous to human life and is a designated restricted possible crime area, and where the reasonable needs of the news media were accomplished by the establishment of a media area close to the primary crash site as provided in the case at bench.

"Under the circumstances of this case, the arrest of the plaintiff was lawful and accordingly his causes of action for relief are denied as to all counts."

". . . would entertain argument with respect to changing some of the language in the intended decision."[7] Over Leiserson's objection, Judge Duffy then entered judgment against him.

DISCUSSION

I

██ Leiserson initially contends that because Judge Carter died before the hearing on objections to the "Intended Decision" had been completed, Judge Duffy improperly signed and entered the judgment in conforming with the "Intended Decision."[8] He relies principally on this court's decision in *Armstrong* v. *Picquelle* (1984) 157 Cal.App.3d 122 [203 Cal.Rptr. 552] as well as *Swift* v. *Daniels* (1980) 103 Cal.App.3d 263 [162 Cal.Rptr. 863]. Both *Armstrong* and *Swift,* however, involve the very different situation where, although a tentative decision was rendered, no statement of decision was ever prepared or signed by the trial judge. (See especially *Armstrong, supra,* 157 Cal.App.3d at p. 127.) As the *Swift* court explained, section 635 cannot be invoked to defeat the principle that "the judge who hears the evidence should be the one to decide the case." No violence is done to that principle here because Judge Carter's "Intended Decision" is in reality the "statement of decision" initially requested by Leiserson pursuant to section 632.

We recognize that the fact that a party may file objections to a proposed statement of decision pursuant to California Rules of Court, rule 232(d) necessarily implies that the statement may be modified, perhaps even to the point of changing the result. We are presented here, however, with a situation in which there is no indication such modification was contemplated or ever considered. Judge Carter's "Intended Decision"—in reality a proposed statement of decision—provides a complete and adequate basis for appellate review. In such circumstances, we hold a presiding judge is empowered by section 635 to sign and enter the judgment.

---

[7]We cannot confirm counsel's representation because the hearing before Judge Carter was unreported. Significantly, however, Leiserson did not challenge defense counsel's representation.

[8]Code of Civil Procedure section 635 on which Judge Duffy relied in signing the judgment, provides: "In all cases where the decision of the court has been entered in its minutes, and when the judge who heard or tried the case is unavailable, the formal judgment or order conforming to the minutes may be signed by the presiding judge of the court."

## II

The critical issue in this case is the lawfulness of Officer Edwards' order to Leiserson to keep out of the crash area.[9] Relying on the guaranteed press access provided for in Penal Code section 409.5(d), Leiserson forcefully argues that the facts as presented at trial do not support the trial judge's conclusion that Edwards issued a lawful order.

Section 409.5(a) authorizes police officers and other designated government officials to cordon off and close a disaster area to the general public where the disaster has created "a menace to the public health or safety." Subdivision (d) of that section, however, limits application of subdivision (a) to persons other than "duly authorized representative[s]" of various news media organizations. (*Ante*, fn. 2.) Relying on subdivision (d), Leiserson asserts that members of the press have an unrestricted right to enter a disaster site for the purpose of news gathering so long as they do not interfere with emergency crews' performance of their duties. Since there is no evidence in the present case of any such interference, Leiserson claims that Edwards' order to leave the area was unlawful.

Not surprisingly, neither Sergeant Capps nor Officer Edwards was familiar with the substance of section 409.5. It does not appear that their decision to cordon off the crash site was consciously based on the authorization contained in subdivision (a) and it is clear they were unaware of the limitations on their authority which were contained in subdivision (d). Instead, the officers seem to have taken the actions they perceived to be reasonable under the circumstances.

There is no doubt in the present case that Leiserson was "a duly authorized representative of [a] . . . television station" guaranteed certain rights of access to disaster sites by section 409.5(d). More importantly, Edwards recognized him as such. Thus, the singular issue we must decide is the extent of access guaranteed by the statute to Leiserson.

Defendants argued and the trial court articulated three independent justifications for Officer Edwards' order excluding Leiserson from the crash site. The first involved Edwards' perception that the crash site posed a safety hazard to members of the press. Under the trial court's theory, section

---

[9]Leiserson was arrested for violating section 148.2 which provides:

"Every person who willfully commits any of the following acts at the burning of a building or at any other time and place where any fireman or firemen or emergency rescue personnel are discharging or attempting to discharge an official duty, is guilty of a misdemeanor:

" . . . . . . . . . . . . . . . . . . . . . . . . .

"2. Disobeys the lawful orders of any fireman or public officer."

409.5(d) gives the press access to a disaster site only if police personnel determine that such access would be safe.

The problem with this argument is that pursuant to subdivision (a) of section 409.5, the power to exclude the general public from a disaster site only arises where the disaster creates "a menace to the public health or safety." Thus the press access provision of subdivision (d) assumes the existence of an already-determined safety hazard. Notwithstanding such a safety hazard, the Legislature has concluded that the public's right to know is more important.[10]

Defendants protest that they have a duty to protect the public and might face civil liability if members of the media were injured after having been granted access to a disaster site. We assume there is more than an element of advocacy in the argument since cities' views of a police officer's duty seem to expand and contract depending on the contested issue. (Compare *Davidson* v. *City of Westminster* (1982) 32 Cal.3d 197 [185 Cal.Rptr. 252, 649 P.2d 894] (no duty to protect potential crime victim); *Harris* v. *Smith* (1984) 157 Cal.App.3d 100 [203 Cal.Rptr. 541] (no duty to protect other motorists from drunk driver); see generally *Hucko* v. *City of San Diego* (1986) 179 Cal.App.3d 520 [224 Cal.Rptr. 552].) In any event, the statute in no way precludes a police officer from recommending to press personnel that they not enter a disaster site. Presumably their entry after such a warning would constitute assumption of the risk of injury and eliminate any possibility of civil liability.

The trial court also referred to Sergeant Capps' testimony regarding the establishment of a cordoned-off "press area" at one edge of the crash site, from which the general public was also excluded. The court's decision suggests it viewed the designation of the area as sufficient access to satisfy the statute. We, however, have serious concerns about how a designated press area, even if located within the disaster area from which the general public is excluded, comports with a statute which specifically authorizes representatives of the press to enter closed areas. Defendants respond that it is unrealistic to believe that the large numbers of media personnel who will normally be on hand to cover a major disaster can have unrestricted access to the disaster area without interfering with the work of emergency crews. They note that particularly in a case such as this where the disaster is confined to a relatively small geographical area, the mere *presence* of large numbers of reporters and photographers will necessarily hamper police, medical and firefighting personnel.

---

[10]Leiserson observes that war correspondents are regularly permitted to enter combat zones which are off limits to other civilians.

We do not believe that in enacting section 409.5(d), the Legislature intended that media access be unrestricted when the presence of reporters or photographers actually interferes with the work of emergency crews. Leiserson seems to concede as much but argues that exclusion cannot be ordered until the actual interference occurs, and then only individually as to the press member who interfered. This interpretation would require that the police initially stand by and permit unrestricted access even when actual interference was inevitable, thereby increasing the risk of personal injury and property damage and perhaps endangering the emergency personnel. Such an interpretation, putting a premium on the lack of foresight, is unrealistic and unwarranted.

On the other hand, we deal here with a statute which represents the Legislature's considered judgment that members of the news media must be afforded special access to disaster sites in order that they may properly perform their function of informing the public. (See 67 Ops.Cal.Atty.Gen. 535, 539 (1984); see generally *Branzburg* v. *Hayes* (1972) 408 U.S. 665, 706 [33 L.Ed.2d 626, 654, 92 S.Ct. 2646].) Accordingly, press representatives must be given unrestricted access to disaster sites unless police personnel at the scene reasonably determine that such unrestricted access *will interfere* with emergency operations. If such a determination is made, the restrictions on media access may be imposed for only so long and only to such an extent as is necessary to prevent actual interference. This means that members of the press must be accommodated with whatever limited access to the site may be afforded without interference. Here, for instance, the special press area designated by Sergeant Capps constitutes an attempt at such an accommodation. Others might include unrestricted access to the site for some limited number of persons, apportioned on some equitable basis. (See, e.g., *Los Angeles Free Press, Inc.* v. *City of Los Angeles* (1970) 9 Cal.App.3d 448, 456 [88 Cal.Rptr. 605].) We assume that the police and press will find it to their mutual advantage to cooperate in such circumstances, consistent with the legislative goal that the maximum possible press access be provided.

The record in the present case, however, fails to demonstrate facts sufficient to justify Leiserson's exclusion from the crash site on this theory. The defendants failed to show: (1) that unrestricted press access would have actually interfered with the emergency crews' performance of their duties; and (2) that the designated press area was the maximum access possible under the circumstances.[11] In any event, even if limited access were theo-

---

[11] The fact that Leiserson traversed the crash site for half an hour before his arrest—apparently without interfering with anyone—is certainly strong evidence that at least some press access to the entire crash site was reasonable.

retically permissible in this situation, it would only have been adequate as applied to Leiserson had he been made aware of the designated press area established by Sergeant Capps. Here, Edwards never directed Leiserson to the designated press area or even informed him of its existence.

Finally, the trial court relied on Sergeant Capps' testimony regarding the information provided him by two CHP officers in concluding that Edwards' exclusion order was valid because the crash site was the scene of a possible crime, i.e., the assassination of California Lieutenant Governor Mervyn Dymally. Defendants assert that section 409.5 only authorizes exclusion of the general public based on the occurrence of a disaster. Therefore, the limitation on this power to exclude—subdivision (d)'s guarantee of press access—only applies where the exclusion is based solely on the site's status as a disaster scene. Here, defendants argue, Sergeant Capps' order to exclude nonemergency personnel was not based solely on the crash site being a disaster area subject to closure under section 409.5, but was also founded on his concern for protecting the scene of a possible crime. Such scenes, according to defendants, have traditionally been subject to exclusion orders which apply to the press as well as the general public. (See generally *Los Angeles Free Press, Inc.* v. *City of Los Angeles, supra,* 9 Cal.App.3d at p. 455.)

Leiserson does not contest that the police can reasonably exclude members of the press from an area in which the commission of a crime is being investigated. He does argue, however, that neither Sergeant Capps nor Officer Edwards could reasonably have believed the crash site to be the scene of a crime based on the information known to them at the time Leiserson was arrested. Accordingly Leiserson concludes that Edwards' exclusion order cannot be justified by a "scene of the crime" exception.

We emphasize that in responding to Leiserson's argument, we confront a finding of fact by the trial judge indicating he believed Sergeant Capps' testimony regarding the CHP officers' report. ■ "Where a factual determination is based on live witness testimony or review of physical evidence, there is every reason to believe a trial court's resolution will be more accurate than that of an appellate court which received no firsthand exposure to the evidence. Thus, the substantial evidence standard of review appropriately accords considerable deference to a trial court's factual findings." (*Hurtado* v. *Statewide Home Loan Co.* (1985) 167 Cal.App.3d 1019, 1024 [213 Cal.Rptr. 712].)

■ Frankly we have pondered the question whether the "Mervyn Dymally incident" was in whole or part a post hoc justification for an exclusion order which was in reality based on reasonable, but nonetheless

legally erroneous, grounds for concern of the safety of the press. Our suspicion has been reinforced by the lack of names or any other confirmatory evidence. In addition, Capps admitted to having no awareness of section 409.5 at the time he issued the exclusion order. Nonetheless, consistent with the institutional deference we must accord trial court findings of fact, we conclude the trial court's decision regarding the investigation of a possible crime is supported by substantial evidence. Sergeant Capps' testimony is sufficient for the trial court to have concluded that Capps reasonably believed the crash site was the scene of a possible crime and therefore justified the exclusion of press personnel from the immediate area.

The fact that Edwards was never told by Capps of the suspected crime is not determinative. Capps ordered Edwards to keep all nonemergency personnel away from the crash site. The order did not distinguish between members of the press and the general public. A superior officer in the police chain of command need not explain all the reasons for an order to his subordinates for the order to be a valid one. ██ ──██ It is sufficient if Capps reasonably believed that the crash site was the scene of a possible crime and on that basis ordered Edwards to exclude press and public alike.[12]

Thus, although two of the three justifications relied on by the trial court for Officer Edwards' exclusion order were insufficient, the court's findings with respect to the third justification are supported by substantial evidence. We therefore affirm the judgment.

## DISPOSITION

Judgment affirmed. The parties to bear their respective costs.

Kremer, P. J., and Work, J., concurred.

On September 3, 1986, the opinion was modified to read as printed above.

---

[12]Leiserson also asserts that the trial court erroneously relied on the hearsay statements of the two unidentified CHP officers which were admitted for the limited purpose of proving Capps' state of mind. (See Evid. Code, § 1250, subd. (a).) But since the legality of Leiserson's arrest turns on whether Edwards had "reasonable cause to believe" he had disobeyed a lawful order (see § 836, subd. 1) and since Edwards was acting on Capps' orders, the only relevant question *is* Capps' state of mind. Accordingly, the court's reliance on the hearsay statements was proper.