Filed 7/10/15  Pavan v. Walmer CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| BARRY PAVAN et al., | C073012 |
| Plaintiffs, Cross-Defendants and Appellants, | (Super. Ct. No. 07AM04185) |
| v. | |
| LOLA M. WALMER et al., | |
| Defendants, Cross-Complainants and Appellants, | |
| CITY OF CITRUS HEIGHTS, | |
| Defendant, Cross-Complainant and Respondent, | |
| MIKE MAGERS et al., | C073012 |
| Plaintiffs, Cross-Defendants and Appellants, | (Super. Ct. No. 34200700881239CLORGDS) |
| v. | |

1

PAT COCHRAN et al.,

        Plaintiffs, Cross-Defendants and Respondents,

BARRY PAVEN, et al.

        Defendants, Dross-complainants and Appellants.

These appeals arise from litigation over a private easement and a partly overlapping public easement. Following a court trial before an assigned judge, the judge found in favor of the parties seeking to enforce the easements (including the City of Citrus Heights; hereafter, the city) and prepared a statement of decision to that end. When the assigned judge later became unavailable, the presiding judge signed the judgment under Code of Civil Procedure[1] section 635 over the objection of the parties who opposed the easements. They appealed.

Subsequently, some of the parties who had succeeded in enforcing the public easement (*not* including the city) filed a motion for attorney fees under section 1021.5. The presiding judge denied that motion. A motion for new trial/motion to vacate followed. The presiding judge denied that motion as well. The parties who sought attorney fees appealed from the order denying their fee motion and from the order denying their motion for new trial/motion to vacate.

On their appeal from the judgment, the parties who opposed the easements contend: (1) the offer of dedication for the public easement was never effective; (2) the city was estopped from accepting the offer; (3) individual members of the public were not entitled to enforce the public easement; (4) there was no substantial evidence to support

---

[1]    All further undesignated section references are to this code.

enforcement of the private easement; and (5) the presiding judge had no power to sign the judgment. We find no merit in these arguments and therefore affirm.

On their appeal from the order denying their motion for attorney fees and the order denying their motion for new trial/motion to vacate, the parties who sought the fee award contend: (1) the presiding judge lacked jurisdiction to deny their fee motion; (2) the parties who opposed the easement waived any objections to a fee award; and (3) the presiding judge erred in denying the fee motion. We find no merit in these arguments either. We also conclude that the order denying the motion for new trial/motion to vacate was not appealable. Accordingly, we dismiss the appeal from that order and affirm the order denying the fee motion.

FACTUAL AND PROCEDURAL BACKGROUND[2]

This case involves certain rural properties now located within the City of Citrus Heights. So far as we can determine, originally there were two parcels known as lot 183 and lot 184 that lay adjacent to each other south of Twin Oaks Avenue, with lot 184 to the west and lot 183 to the east. In 1975, it appears, the southern portion of both of those lots was owned by the DeBernardis. The DeBernardis wanted to subdivide their properties but could not meet a zoning requirement that required every building lot to have at least 75 feet of frontage on a public street. Ultimately, however, they were granted a variance on the condition that they make two offers of dedication, only one of

---

[2] The factual background of this litigation is difficult to recount because none of the parties provided us with a comprehensive summary of the facts proven at trial presented in the light most favorable to the judgment and supported by citations to the record on appeal (as they ought to have done). Moreover, our own attempt to make sense of the underlying facts is hampered by the fact that much of the pertinent trial testimony refers to exhibits that either were not designated for inclusion in the clerk's transcript or that *were* designated for inclusion but had been returned to the parties and were not delivered to the superior court clerk for inclusion in the transcript after they were designated.

3

which is at issue here.[3]  Specifically, the DeBernardis were required to make an offer of dedication of a strip of land 42 feet wide that straddled the eastern edge of lot 184 and the corresponding western edge of lot 183 for the extension of Catalpa Drive northward to connect with Jurgens Lane, a private roadway that ran south from Twin Oaks Avenue along the boundary of lots 183 and 184 on the portions of those lots north of the portions the DeBernardis owned.  The DeBernardis signed the offer of dedication for the extension of Catalpa Drive on October 27, 1975.

The same day they signed the offer of dedication, the DeBernardis deeded a portion of lot 183 to Frank and Mary Pavan.  That deed specifically referenced the offer of dedication.

In 1995, Frank and Mary Pavan, joined by their son, Barry, and his wife, Patsy, purchased the remainder of the DeBernardis' property -- that is, their remaining part of lot 183 and all of their part of lot 184.

In 2001, Bonnie Pollock and her husband, Donald, sold that part of lot 184 lying north of the Pavans' property to George and Lola Walmer and their daughter, Donna Gonsalves.  That property was bisected by a creek that would flood periodically.  When the creek flooded, the southern part of the property could not be reached from the north; instead, access could be had only by means of a 21-foot-wide easement south across the Pavans' property to Catalpa Drive, which, at its northern end, partially overlapped the area subject to the offer of dedication made in 1975.[4]  During this flooding, the bridge that carries Jurgens Lane over the creek could become completely submerged.

Also in 2001, the Pavans sought to subdivide their property into four parcels: three on that part of the property that was originally part of lot 184 and the fourth on that

---

**3**     The parties refer to the offer of dedication as the IOD, for irrevocable offer of dedication.

**4**     The private easement apparently dates back to 1955.

4

part of the property that was originally part of lot 183. As one of the conditions of approval of the subdivision, the city's engineering department required the abandonment of the offer of dedication to extend Catalpa Drive.

Sometime thereafter, a dispute arose over access to the south across the Pavans' property from Jurgens Lane due to the periodic flooding that could make Jurgens Lane impassible. In addition to the Walmers and Gonsalves, who sought to enforce their private easement, certain individuals who own parcels along the east side of Jurgens Lane north of the Pavans' property -- Mike Magers, Pat Cochran, and Man and Chun Ko (hereafter, the Magers parties) -- sought to secure access across the Pavans' property using the area subject to the offer of dedication for the extension of Catalpa Drive. The city manager was involved in trying to resolve the dispute, but his efforts were unsuccessful. Accordingly, in April 2007, this litigation commenced when the Pavans filed suit against the Walmers and Gonsalves to quiet title to the area subject to the private easement (case No. 07AM04185), claiming abandonment and termination by prescription. In September 2007, the Walmers and Gonsalves filed a cross-complaint against the Pavans seeking to enforce the easement.[5]

Shortly thereafter, in November 2007, the Magers commenced a separate action against the Pavans (case No. 34200700881239CLORGDS) seeking to enforce what they described as a 42-foot-wide easement across the Pavans' property recorded in 1975.[6] In fact, this "easement" was the offer of dedication for the extension of Catalpa Drive.

Meanwhile, sometime in the fall of 2007, a representative of the Sacramento Metropolitan Fire District informed the city that the Jurgens Lane bridge was unfit for

---

[5]    George Walmer later died before trial of the matter.

[6]    The parties failed to designate for inclusion in the clerk's transcript many of the pertinent pleadings (complaints and cross-complaints) in both cases in the trial court. On our own motion, we take judicial notice of those pleadings.

emergency vehicles and therefore the fire department required access across the Pavans' property to provide emergency services to the residents of Jurgens Lane. To secure such access, the city adopted a resolution on December 13, 2007, accepting the offer of dedication made in 1975 and thereby converting the area subject to the offer into a public easement.

Following the city's action, the Pavans filed a cross-complaint against the Magers parties and the city in case No. 34200700881239CLORGDS and an amended complaint in case No. 07AM04185 that added the city as a defendant. In response, the city cross-complained against the Pavans in both cases.

In 2008, the two cases were consolidated for all purposes. The consolidated cases were ultimately tried to the court before an assigned judge over five days in February 2011. Following the close of the Pavans' case, the Magers parties (not including Cochrane), Walmer, and Gonsalves (hereafter, jointly, the owners) moved for judgment under section 638 on the issue of the public easement resulting from the offer of dedication. The city joined in that motion. The assigned judge granted the motion, and the trial continued on the issue of the private easement.

Following the conclusion of testimony, the parties filed closing briefs. On April 26, 2011, the assigned judge gave some of the parties permission to file supplemental briefs, which were due no later than May 16, when the matter would be deemed submitted.

On August 29, 2011, the assigned judge filed his statement of decision. The judge found that the offer of dedication in 1975 was valid and had not been abandoned or extinguished and the private easement was still in existence and had not been abandoned or lost by prescription. The court directed the entry of judgment in favor of Walmer, Gonsalves, the Magers parties, and the city and against the Pavans with respect to the various complaints and cross-complaints.

6

The clerk mailed the statement of decision to the parties on September 1, 2011. On September 12, the Pavans filed their objections to the statement of decision. First, the Pavans objected to the assigned judge's determination that the offer of dedication was in effect when Frank and Mary Pavan acquired the first part of lot 183 in 1975. Second, the Pavans objected (somewhat obtusely) to the fact that the statement of decision did not address whether the city was estopped from accepting the offer of dedication because of the actions the Pavans took in subdividing their property in reliance on the city's direction that the offer of dedication was to be abandoned as a condition of approval of the subdivision. Third, the Pavans argued the statement of decision was "in error" in granting injunctive relief to the individual landowners because the public cannot acquire rights in or enforce a public easement. Fourth, the Pavans contended that the statement of decision failed to address the disposition of various parts of the public and private easements. Finally, the Pavans complained that the statement of decision relied on "incredulous testimony" and was contrary to the law on the issues of abandonment and hostility.

On September 22, the owners circulated a proposed judgment. The Pavans responded that it would be premature to submit a judgment because the assigned judge had not yet ruled on their objections to the statement of decision. Nevertheless, on September 29, the owners submitted their proposed judgment to the assigned judge. In response, on October 3 the city submitted its own, competing proposed judgment. The following day, the city filed a response to the Pavans' objections to the statement of decision.

Thereafter, almost five months passed with no apparent action by the assigned judge on the Pavans' objections to the statement of decision or the proposed judgments. Then, on February 28, 2012, the assigned judge sent a fax to the attorneys noting that the city's proposed judgment had "appeared on [his] desk" "[s]ome time back, near the end of October last" and asking whether any of them had any comment. The Pavans'

7

attorney apparently responded the following day, and the assigned judge replied nearly two weeks later, on March 12, noting that he had not received the Pavans' objections to the statement of decision or any objections to the proposed judgments and asking the Pavans' attorney to fax those documents to his office in Eureka. The following day, the assigned judge advised the parties by fax that he had received the objections to the statement of decision from the Pavans' attorney and also had both proposed judgments. He further wrote, "If there exists [*sic*] other objections or proposals, please send them directly to me in Eureka."

Apparently that was the last the parties heard from the assigned judge. Almost five months later, on August 1, 2012, counsel for Walmer and Gonsalves noticed a posttrial status conference for October 12 before the presiding judge to address the final resolution of the consolidated actions. In response, someone from the court apparently called the attorney and informed her that the assigned judge was no longer available and a new judge would have to be assigned to the case and would either have to review the trial transcripts or retry the case. Counsel wrote to the court and contended the presiding judge could instead enter judgment based on the statement of decision.

Following the status conference on October 12, 2012, the presiding judge (Judge Earl) ordered briefing on the entry of judgment. Ultimately, she determined that the statement of decision "was a final decision" and judgment should be entered on it under section 635. Judgment was entered on December 20, 2012. The Pavans timely appealed.

In March 2013, the owners moved for an award of attorney fees under section 1021.5. The Pavans opposed that motion. The presiding judge denied the motion, concluding "that [the owners'] private enforcement of the [offer of dedication] was not necessary because the City's defense of the public's interest in the [offer of dedication] was complete, and sufficient to protect the [owners'] interests as members of the public." The presiding judge also concluded "that the private benefits of the [owners'] action outweighed the public benefits, so the costs they incurred to enforce the [offer of

8

dedication] were proportionate to the private benefit that they would gain from the action."

In May 2013, the owners filed a motion for new trial and a motion to vacate the denial of their fee motion under section 663, contending the presiding judge lacked jurisdiction to deny a fee award because the assigned judge had already determined their right to such an award and because the Pavans' appeal from the judgment deprived the presiding judge of the power to alter that aspect of the judgment. The presiding judge denied that motion in June 2013, and the owners timely appealed from the order denying their fee motion and the order denying their motion for new trial/motion to vacate.

DISCUSSION

I

*The Pavans' Appeal From The Judgment*

A

*The Timing Of The Offer Of Dedication*

The Pavans argue that the offer of dedication was never effective as to lot 183 because when the DeBernardis made the offer, they did not own the part of lot 183 that the offer covered. More specifically, the Pavans contend the evidence admitted at trial showed that the sale in 1975 by which the DeBernardis sold to Frank and Mary Pavan the part of lot 183 that was covered by the offer of dedication occurred "on October 1, 1975, <u>before</u> the [offer of dedication] was made or recorded by the DeBernardis." We find no merit in this argument.

Although the Pavans do not couch it as such, this argument is, in effect, a challenge to the sufficiency of the evidence to support the assigned judge's factual finding that the offer of dedication "was in effect when the Pavans acquired ownership of th[e] eastern portion of Lot 183" in 1975. Such a challenge triggers the application of well-established rules of appellate review, as follows:

9

" 'When a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact.' [Citations.]

" 'It is well established that a reviewing court starts with the presumption that the record contains evidence to sustain every finding of fact.' [Citations.] [The Pavans] contention herein 'requires [them] to demonstrate that there is *no* substantial evidence to support the challenged findings.' (Italics added.) [Citations.] A recitation of only [the Pavans'] evidence is not the 'demonstration' contemplated under the above rule. [Citation.] Accordingly, if, as [the Pavans] here contend, 'some particular issue of fact is not sustained, they are required to set forth in their brief *all* the material evidence on the point and *not merely their own evidence*. Unless this is done the error assigned is deemed to be waived.' " (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.)

Here, the Pavans have not made the required showing because they have failed to set forth all of the material evidence on the issue of when the sale of the property occurred in 1975 with relation to when the offer of dedication was made. The Pavans assert as an undisputed fact that Frank and Mary Pavan "close[d] on the purchase of lot 183 from the DeBernardis" on October 1, 1975 -- 26 days before the DeBernardis executed the offer of dedication. In support of this assertion, they point to their own evidence -- a "Bill of Sale" purportedly signed by the DeBernardis on October 1, 1975. What the Pavans ignore, however, is the key piece of evidence on which the assigned judge relied: the recorded grant deed by which the DeBernardis granted the part of lot 183 to Frank and Mary Pavan. That deed was signed on October 27, which the Pavans admit is the same day the DeBernardis executed the offer of dedication, and that deed specifically refers to the dedication.

In any event, the grant deed constitutes substantial evidence supporting the assigned judge's finding that the DeBernardis still owned the part of lot 183 they sold to

Frank and Mary Pavan when they made the offer of dedication. While the bill of sale on which the Pavans rely may constitute contrary evidence, for our purposes it is immaterial. As we have noted, our power " '*begins* and *ends* with the determination as to whether there is any substantial evidence *contradicted or uncontradicted* which will support the finding of fact.' " (*Foreman & Clark Corp. v. Fallon*, *supra*, 3 Cal.3d at p. 881, final italics added.) Because the recorded grant deed constitutes substantial evidence supporting the assigned judge's finding of fact, we have no power to overturn that finding.

B

*Estoppel To Accept The Offer Of Dedication*

The Pavans contend the assigned judge erred in failing to consider or address their "estoppel cause of action and evidence," and "the matter must be remanded for consideration of the evidence of estoppel." We disagree.

One of the issues the Pavans identified for trial was "[w]hether the City is estopped from accepting an irrevocable offer of dedication due to the City's demand that the dedication be abandoned and approval of a final map abandoning the dedication." The Pavans also argued estoppel in opposition to the motion for judgment. Among other things, they argued that "there has been no evidence of a public need nor any evidence of an emergency need which would override the application of the doctrine of estoppel."

The assigned judge granted the motion for judgment without stating his reasoning, but stated that the parties were "entitled to have a thorough statement of decision on a matter of this sort."[7] The statement of decision the assigned judge eventually issued did not expressly address the estoppel issue. The assigned judge did, however, describe the

---

[7]     Subdivision (a) of section 631.8 provides that when a court grants a motion for judgment, "the court shall make a statement of decision as provided in Sections 632 and 634, or may decline to render any judgment until the close of all the evidence."

11

"public safety concerns" that, along with other factors, led the city "to decide that the unimpeded [offer of dedication] should remain in place in order to meet the needs of the Owners as well as the public." In particular, the assigned judge noted that some of the properties north of the Pavans' property lie south of a private bridge that is subject to flooding, and "[t]he fire department responsible for this area has stated that they would not drive a fire truck and other equipment across it."

In their objections to the statement of decision, the Pavans, under the heading "**THE CITY WAS ESTOPPED FROM ACCEPTING THE IOD**," asserted that "[t]he proposed Statement of Decision fails to address the clear and unambiguous representations made by the City repeatedly that the [offer of dedication] would be abandoned by the recording of the parcel map or the legal impact of those representations. Likewise, the Statement of Decision does not address the Pavans['] reliance on said representations." The Pavans then proceeded to argue that the city was "estopped from accepting the [offer of dedication] as a matter of law."

On appeal, the Pavans contend "[a] failure to address a material issue in a statement of decision may constitute reasonable [*sic*] error." The applicable principle of law is that "[f]ailure to determine a material issue in a statement of decision can, in some circumstances, be reversible error if there is evidence that would support a finding in the opposing party's favor." (*Triple A Management Co. v. Frisone* (1999) 69 Cal.App.4th 520, 536.) As applicable here, what that means is that if the evidence could have supported a determination by the assigned judge that the city was estopped from accepting the offer of dedication, then it was reversible error for the assigned judge not to make the necessary findings on the estoppel issue in its statement of decision. In our view, however, the assigned judge could not have lawfully found in favor of the Pavans on the issue of estoppel, and therefore his failure to make findings on that issue was harmless.

12

Regardless of whether there was evidence to support findings in favor of the Pavans on the various elements of equitable estoppel (the city contends there was not), it is fundamental that "an estoppel will not be applied against the government if to do so would effectively nullify 'a strong rule of policy, adopted for the benefit of the public.' " (*City of Long Beach v. Mansell* (1970) 3 Cal.3d 462, 493.) Here, as the city points out, such a policy is embodied in Government Code section 7050, the statute under which the offer of dedication was made in this case. That statute provides, in relevant part, that an offer of dedication made pursuant to the statute "may be terminated and the right to accept such offer abandoned in the same manner as is prescribed for the summary vacation of streets or highways by Part 3 (commencing with Section 8300) of Division 9 of the Streets and Highways Code." (Gov. Code, § 7050.) In his statement of decision, the assigned judge here observed that "[t]hose sections require action based on notice and a public hearing of the appropriate legislative body to vacate such public service easements." "[I]f the Legislature has provided a method by which a county or city may abandon or vacate roads, that method is exclusive." (*County of San Diego v. Cal. Water etc. Co.* (1947) 30 Cal.2d 817, 823.) Thus, Government Code section 7050 embodies a strong rule of policy, adopted for the benefit of the public, that an irrevocable offer of dedication made pursuant to that statute can be terminated and the right to accept the offer abandoned by the applicable public entity *only* by means of notice and a public hearing. Because a finding in favor of the Pavans on the issue of estoppel would have had the effect of nullifying that rule, allowing what could be characterized as abandonment by estoppel, the Pavans could not lawfully prevail here on the issue of estoppel. It therefore follows that the assigned judge's failure to make findings on that issue in his statement of decision was harmless.

13

C

*Private Rights In The Public Easement*

The Pavans contend the assigned judge erred in "grant[ing] injunctive relief to the individual neighbors" because " 'dedication is a matter purely between the owner and the public.' " The Pavans' arguments under this heading are a bit of a mishmash, but no matter how generously we construe them, we find no merit in any of them.

To the extent the Pavans rely on our decision in *Biagini v. Beckham* (2008) 163 Cal.App.4th 1000 to support their argument that the assigned judge could not lawfully grant injunctive relief to the individual owners here based on the city's acceptance of the offer of dedication, *Biagini* does not support that argument. In *Biagini*, we explained that under the common law, an offer of dedication can be accepted by the public's use of the area dedicated -- in *Biagini*, a road. (*Id.* at p. 1012.) In the course of explaining that point, we noted that " 'dedication is a matter purely between the owner and the public. There is no such thing as a dedication between the owner and individuals. The public must be a party to every dedication.' " (*Ibid.*, quoting *Prescott v. Edwards* (1897) 117 Cal. 298, 301.) We then went on to find that use of a road that was consistent with a corresponding private easement provided "no basis for finding an implied acceptance of an offer of dedication by public use." (*Biagini*, at pp. 1013-1014.) That conclusion simply has no bearing on the matter at issue here, which is whether -- when the pertinent public agency has formally accepted an offer of dedication -- a private party can obtain injunctive relief to secure their right, as a member of the public, to use the dedicated area. On that point, the Pavans offer no authority.

Again relying on *Biagini*, the Pavans next contend that "any action by an owner to restrict or block access (such as locking gates, landscaping, or other obstruct[ion]s) works to revoke the dedication as against the public and leaves the public with no claim or right in the dedicated area." Again, the Pavans have misconstrued *Biagini*. There, we held that "a statutory offer of dedication can be revoked as to the public at large [under the

14

common law, by acts inconsistent with the use for which it is claimed the land was dedicated], so that it can no longer be accepted by public use, even though the offer must remain open for formal acceptance by the public entity to which the offer was made." (*Biagini v. Beckham*, *supra*, 163 Cal.App.4th at pp. 1014, 1017.)  Under that rule, even if the Pavans engaged in acts that would have prevented the public from accepting the dedication under common law principles by using the dedicated area, those acts had no bearing on the right of the city to formally accept the offer, which it did.  And again, the Pavans offer no authority on the right of the individual landowners to obtain injunctive relief to secure their use of the dedicated area once the city accepted the offer of dedication.

The Pavans next argue that only the city "has any claim in the [offer of dedication]" and the city "did not bring a Motion for Judgment."  This argument ignores the fact that the city joined in the owners' motion.  Moreover, the Pavans once again fail to show any authority that would preclude the individual landowners from obtaining injunctive relief related to the dedicated area.  Absent any such authority, we find no merit in the Pavans' arguments on this point.

D

*The Private Easement*

The Pavans contend the assigned judge's statement of decision was "in error" and "contrary to applicable law" regarding the private easement because the assigned judge relied on "incredulous [*sic*] testimony" from two witnesses regarding their use of the easement and the assigned judge failed to recognize that "the <u>mere act</u> of placing . . . obstacles (whether a fence or a house or trailer) [in the area subject to the easement] [wa]s sufficient evidence of hostility as a matter of law."[8]  In their reply brief, the Pavans

[8]    To the extent the Pavans contend, under this heading, that the statement of decision did "not address the disposition of the sections of the [dedicated area] going

15

recast this argument, asserting that there was no substantial evidence that the private easement was used for ingress and egress. Regardless of how it is cast, we find no merit in the Pavans' contention.

In the statement of decision, the assigned judge described the following testimony regarding use of the private easement:

Gonsalves testified that while "[s]he noted some objects such as a wood pile, a small amount of lumber and some field fencing" in the area of the easement, "[t]hese objects did not block her use of the easement. When necessary she would just go around those things or climb the fence. In a conversation with Barry Pavan at the property, he acknowledged that he owned the remains of the frame of a stock trailer that he pointed out to her that was on the side [of] her easement, but he said he was giving the trailer to her. She also took a new metal gate up to the area of the field fencing that was on her property with intent to install it to ease access by means of her easement to bring in hay and other matters. However the gate had not yet been installed when this litigation commenced. She does intend to install it when this matter is concluded. That would give her easier access to the south portion of her property without having to climb over the fence to bring hay and to see to the needs of her horses.

"She indicated that in the past she had entered her property by means of the easement once or twice a year. The objects sitting on the easement did not block her access to her property. She would just put the hay over the fence or go around the various objects that were sited there. In regard to the Pavan objects on the easement, she told Barry Pavan that they could remain there. She indicated that at some time in the

_____

through the kitchen of the existing residence," we decline to address this contention because: (1) it is not set forth under a separate heading summarizing the point; (2) it is not supported by any citations to the record (except to the statement of decision itself); and (3) it is not supported by any authority or argument. (See Cal. Rules of Court, rule 8.204(a)(1)(B) & (C).)

future she might ask him to have them removed.  Barry Pavan agreed to that arrangement.

"[O]n two oc[c]asions when the flooding came over the top of the bridge on Jurgens Lane, feed for the horses had to be brought in over the easement.  The first was December 2005 and again in January of 2008.

"Bonnie Pollock, [one of the previous owners of the Walmer/Gonsalves property], testified as to their experience with the easement.  They consistently maintained some cattle on the property over the years that they owned the property.  Because of the frequent flooding across Jurgens Lane it was necessary for them to bring hay to the southern portion of their property in over the easement from Catalpa Drive.  She indicated that during some years Jurgens Lane would flood three or four times a year.  During the early years there was lots of flooding but in the last few years of their ownership the flooding would occur not more than every other year."

The assigned judge also made the following findings regarding the alleged obstructions placed in the area of the easement:

"Until a survey was done and a map was drawn as part of this litigation, Gonsalves was unaware of the exact location of the entire easement or that possibly a house had been built on it.  Much was made of that fact but [it] is of no consequence in this matter.  On a revised parcel map the Pavans submitted to the City, it shows that the house is exactly on the east line of the easement and is not encroaching in any manner. . . .

"Much was also made of the fact that at the southern end of the 21 foot easement, an approximately 6 foot high board fence exists.  From the [assigned judge]'s personal visit to the area, with the consent of all the parties, it appeared that this 1955 easement was in a part of the Sacramento County area yet to be sub-divided and developed into building lots.  The homes currently standing along Catalpa Drive all appear to have been constructed well after 1955.  It is unknown as to when the fence was erected or by whom.

17

That board fence is of no consequence in the matter at hand as it does not interfere with access from Catalpa Drive to the [area of dedication] or the 21 foot easement.

"[¶] . . . [¶]

"During the on site view of the easement area by the court, with the consent of all parties, no obstructions of any consequence to the usability of the easement were observed. The wood pile consisted of a small amount of fireplace sized pieces of wood. The trailer was parked completely at the side of what appeared to be the edge of the easement. The 'trailer' was the remains of what could have been a trailer to haul horses. The enclosing panel had been removed, leaving only the frame work and rails attached to the single axle. The amount of grass and weeds growing up around the trailer indicated that it had not been moved for some considerable amount of time. Some rolls of wire and other miscellaneous materials were stacked in such a manner that any pickup sized vehicle could easily drive around it.

"As was the case in their application for a Preliminary Injunction, the Pavans have again failed to establish an abandonment of the easement by the weight of the evidence. . . .

"[¶] . . . [¶]

"[T]he Pavans have [also] failed to establish by the weight of the evidence that they obstructed Gonsalves' use of the easement in any manner at any time before the filing of this litigation. . . . Again the weight of the evidence before this litigation was commenced, is that Gonsalves had access to and use of the easement whenever she had the need.

"[¶] . . . [¶]

"The court finds that the weight of the evidence is that the 21 foot Gonsalves easement is and has been in existence since it was first granted and has not been abandoned nor lost by prescription."

18

The Pavans contend the testimony of Gonsalves and Bonnie Pollock regarding their use of the easement does not qualify as "substantial evidence" because they testified "that, in their middle age, they routinely climbed over field fences and through debris to access Catalpa." In the Pavans' view, this testimony was "incredulous" -- i.e., unbelievable -- and "[w]here a finding is not within the realm of what a reasonable trier of fact could find, the finding is not supported by substantial evidence."

"When there is substantial evidence, although conflicting, that sustains the judgment an appellate court will not substitute its evaluation of the evidence or its opinion as to the credibility of the witnesses for that of the trial court." (*Romero v. Eustace* (1950) 101 Cal.App.2d 253, 254.) Although "[t]he rule that the amount of credit to be given to the positive testimony of a witness is solely a question for the trial court is not applicable in a case in which the testimony, in the light of the undisputed facts, is so inherently improbable and impossible of belief as in effect to constitute no evidence at all," "[i]n order that the court may be justified in disregarding evidence as being inherently improbable and unbelievable there must exist a physical impossibility of its being true or its falsity must be apparent without resort to inferences or deductions." (*Ibid.*)

The Pavans have not shown that it was physically impossible for Gonsalves and Pollock to have used the easement as they testified they did, nor have the Pavans shown that their testimony was demonstrably false without resort to inferences or deductions. "Since from the record we cannot say the evidence is improbable or impossible of belief, we must follow the rule so frequently announced that we must view the evidence in the light most favorable to respondent[s] and resolve all conflicts in [their] favor." (*Romero v. Eustace*, *supra*, 101 Cal.App.2d at p. 254.) Accordingly, contrary to the Pavans' argument, the testimony of Gonsalves and Pollock *does* constitute substantial evidence supporting the assigned judge's finding that the easement was used and was not abandoned.

19

As for whether the easement was lost by the Pavans' prescriptive use of the easement area, the Pavans argue that "the evidence and law require the finding that the easement was lost by prescription where a house blocked access to most of the easement and a 6' high fence completely blocked use of the easement." In making this argument, the Pavans completely disregard the assigned judge's findings that "that the house is exactly on the east line of the easement and is not encroaching in any manner" and that the "board fence is of no consequence in the matter at hand as it does not interfere with access from Catalpa Drive to the . . . the 21 foot easement." Instead, they simply contend -- without any citation to the record -- that "[t]he evidence at trial showed" that the easement "terminate[d] in a 6' high plank fence at the south end of the easement area" and that "[a] house was erected within the easement area in 1985 blocking use of most of the easement."

The Pavans' argument is without merit. As we have explained already, where an appellant seeks to attack a factual finding by the trial court, we presume there is substantial evidence to support the finding, and the appellant bears the burden of positively demonstrating that there was not by setting forth *all* of the evidence on the point and showing why that evidence is not substantial and/or does not support the finding. The Pavans have made no attempt to carry that burden here. The assigned judge found that neither the house nor the plank fence obstructed the easement, and it is not enough for the Pavans to simply argue, without citation to the record, that they did.

E

*Signing Of The Judgment Under Section 63*

The Pavans contend it was error for the presiding judge to sign the judgment based on the assigned judge's statement of decision because that decision was not final. We disagree.

"In all cases where the decision of the court has been entered in its minutes, and when the judge who heard or tried the case is unavailable, the formal judgment or order

20

conforming to the minutes may be signed by the presiding judge of the court or by a judge designated by the presiding judge." (§ 635.) The issue here is whether the statement of decision the assigned judge issued and filed in the case can be considered "the decision of the court" for purposes of section 635.[9]

The Pavans first assert that "[a] tentative or proposed statement of decision is not binding and cannot be considered a final statement of decision unless the court expressly orders such." The case they cite for this proposition, however -- *In re Marriage of Ditto* (1988) 206 Cal.App.3d 643 -- had nothing to do with the finality of a statement of decision for purposes of determining whether the presiding judge can sign a judgment under section 635, as occurred here. Rather, the issue in *Ditto* was whether the appellant could use a memorandum of intended decision to show that the trial court erred in dividing the community property in a case where a statement of decision was not requested and where no other part of the record indicated the basis for the court's decision regarding division of the community property. The appellate court concluded that the memorandum of intended decision could *not* be used for that purpose. (*In re Marriage of Ditto*, at pp. 646-649.) That conclusion is of no assistance to the Pavans, and the case does not stand for any other proposition that would assist the Pavans here.

The Pavans next contend that "[i]n order for a statement of decision to be 'final', for CCP §635 purposes, the proposed decision must be filed along with a minute order stating that it is the 'final' statement of decision." In support of this proposition, they cite *Raville v. Singh* (1994) 25 Cal.App.4th 1127.

In *Raville*, following a bench trial the trial judge announced his tentative decision in open court, and one of the defendants timely requested a statement of decision. (*Raville v. Singh*, *supra*, 25 Cal.App.4th at p. 1129.) The plaintiff submitted a proposed

---

[9] There is no dispute here that the assigned judge was unavailable, although the reason for his unavailability is not a matter of record.

21

statement of decision and judgment to the trial judge, who notified the parties that he was holding the proposed statement to allow the defendants to file objections. (*Ibid.*) Both defendants timely filed objections to the proposed statement of decision and judgment, but the trial judge died before he could rule on those objections. (*Id.* at p. 1130.) The plaintiff submitted the proposed statement of decision and judgment to the supervising judge for signature, who signed them. (*Ibid.*) One of the defendants moved for a new trial on the ground (among others) that the judgment was against the law. (*Ibid.*) In opposition to the motion, the plaintiff's attorney attested that the proposed statement of decision and judgment were dictated by the trial judge and recorded verbatim by telephone. (*Ibid.*) The supervising judge denied the new trial motion. (*Ibid.*)

On appeal, the appellate court reversed because "the decision of the court" had not been entered in the court's minutes as required by section 635. (*Raville v. Singh*, *supra*, 25 Cal.App.4th at pp. 1130-1133.) In reaching that conclusion, the appellate court rejected the argument that the trial judge had prepared a statement of decision in the case because he had dictated the document to the plaintiff's attorney verbatim, noting that "[t]his argument not only takes liberty with the definition of 'prepare' but also ignores the fact that [under the statutory scheme] this was only a *proposed* statement of decision." (*Id.* at p. 1133.) According to the appellate court, "the decision of the court is the finalized statement of decision. That decision is then entered in the minutes, as contemplated by section 635, by filing the statement of decision and concurrently noting this filing in a minute order. This was not accomplished here." (*Raville*, at p. 1133.) In the appellate court's view, "When the trial judge becomes unavailable before the entire process contemplated in section 632, and [former] California Rules of Court, rule 232 [now rule 3.1590] has been completed, the parties have been deprived of a full and fair trial." (*Raville*, at p. 1132.)

*Raville* does stand for the proposition that it is error for the presiding judge to sign a judgment under section 635 when the trial judge has become unavailable before the trial

judge has completed the process of ruling on objections to a proposed statement of decision. The problem with *Raville*, however, is that it fails to consider the constitutional principle that only *prejudicial* error is reversible. Article VI, section 13 of the California Constitution provides that a judgment cannot be set aside "unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." "This fundamental restriction on the power of appellate courts is amplified by Code of Civil Procedure section 475, which states that trial court error is reversible only where it affects '. . . the substantial rights of the parties . . . ,' and the appellant 'sustained and suffered substantial injury, and that a different result would have been probable if such error . . . had not occurred or existed.' Prejudice is not presumed, and the burden is on the appealing party to demonstrate that a miscarriage of justice has occurred." (*Waller v. TJD, Inc.* (1993) 12 Cal.App.4th 830, 833.)

An example of the application of the harmless error doctrine to irregularities in the process of finalizing a statement of decision can be found in *Heaps v. Heaps* (2004) 124 Cal.App.4th 286. There, the trial judge signed a proposed statement of decision before the time for filing objections to it had expired. (*Id.* at p. 292.) The appellate court concluded the error was harmless because while the appellant did file objections, "those objections did not identify any inconsistencies with the intended decision. Her objections were 67 pages arguing that the evidence should be reweighed in her favor. Those objections went to the underlying *merits* of the proposed decision, not its *conformity* with what the trial court had previously announced." (*Ibid.*) The court also noted that it was not reversible error for the trial court to have ignored the issue of laches in its statement of decision (which the appellant apparently mentioned in her objections) because that issue was not raised by the pleadings and therefore the trial court was not obligated to make findings on it. (*Id.* at p. 293.)

23

*Leiserson v. City of San Diego* (1986) 184 Cal.App.3d 41 can also be understood as applying the harmless error doctrine -- albeit implicitly -- to an irregularity in the issuance of a final statement of decision. In *Leiserson*, in response to the plaintiff's request for a statement of decision, the trial judge prepared an " 'Intended Decision' " in which he explained the basis for his decision in favor of the defendants. (*Id.* at pp. 41, 46.) The plaintiff filed a number of specific objections to the " 'Intended Decision,' " and a hearing was commenced on those objections but was not completed before the judge died. (*Id.* at p. 47.) The defendants moved under section 635 to have judgment entered by the acting presiding judge in conformity with the " 'Intended Decision.' " (*Leiserson*, at p. 47.) In support of their motion, the defendants asserted that during the first part of the hearing on the plaintiff's objections to the decision, the trial judge had indicated " 'his decision would remain the same' although he '. . . would entertain argument with respect to changing some of the language in the intended decision.' " (*Id.* at pp. 47-48.) The plaintiff did not dispute this assertion. (*Id.* at p. 48, fn. 7.) The acting presiding judge entered judgment as requested. (*Id.* at p. 48.)

On appeal, the appellate court found no error. (*Leiserson v. City of San Diego*, *supra*, 184 Cal.App.3d at p. 48.) The court concluded that the " 'Intended Decision' " was, in fact, the statement of decision the plaintiff had requested. (*Ibid.*) And while "the fact that a party may file objections to a proposed statement of decision pursuant to [the] California Rules of Court . . . necessarily implies that the statement may be modified, perhaps even to the point of changing the result," "there [wa]s no indication such modification was contemplated or ever considered" in this case. (*Ibid.*) Because the " 'Intended Decision' " was "in reality a proposed statement of decision" that "provide[d] a complete and adequate basis for appellate review," the court concluded that the "presiding judge [wa]s empowered by section 635 to sign and enter the judgment." (*Leiserson*, at p. 48.)

24

Although the appellate court in *Leiserson* did not speak in terms of harmless error, the court can be understood to have concluded that where the trial court issued a document with the detail required of a statement of decision, and where the record contained no indication that the court was inclined to modify that document, no prejudice had been shown in the signing of the judgment under section 635 based on that document.

We believe a similar conclusion is warranted here. The assigned judge prepared a detailed document that he called his statement of decision, and he filed it in the case. Even if we were to assume it was error for the presiding judge to treat that document as "the decision of the court" for purposes of section 635 because the trial judge never ruled on the Pavans' objections to it and therefore -- in the words of the *Raville* court -- "the entire [statement of decision] process . . . ha[d not] been completed" (*Raville v. Singh*, *supra*, 25 Cal.App.4th at p. 1132), the Pavans have failed to show that they suffered any prejudice from the error, in the sense that they have not shown that they probably would have obtained a better result if the trial judge *had* considered their objections before the judgment was signed. The fact of the matter is that the Pavans' objections to the statement of decision were virtually *identical* to the arguments they have made on appeal, which we have rejected already above. Having rejected all of those arguments ourselves, we find no basis for concluding that the assigned judge probably would have reached a result more favorable to the Pavans if only *he* had considered those arguments.

As to the Pavans' first argument, we have concluded that there was substantial evidence in the record to support the assigned judge's finding that the DiBernardis owned part of lot 183 when they made the offer of dedication affecting that property. The Pavans have given us no reason to believe the assigned judge would have made a different finding had he considered their views of the evidence on this point in their objections to his statement of decision.

25

As to the Pavans' second argument, we have concluded that the Pavans could not lawfully prevail here on the issue of estoppel. Accordingly, much like the trial court's failure to make findings on the issue of laches in *Heaps*, here the assigned judge's failure to make findings in its statement of decision on the issue of estoppel was harmless.

As to the Pavans' third argument, we have found no merit in their contention that the assigned judge could not grant injunctive relief to the individual owners to secure their right to use the public easement that resulted from the city's acceptance of the offer of dedication. Consequently, there is no reason to believe the assigned judge would have denied this injunctive relief if he had considered this meritless argument himself.

Finally, as to the Pavans' fourth argument, we find no reason to believe the assigned judge, having credited the testimony of Gonsalves and Pollock as to their use of the private easement in preparing his statement of decision, likely would have reached a different conclusion if only he had considered the Pavans' assertion that the testimony of these witnesses was "incredulous." We also find no reason to believe the assigned judge would have altered his finding that the house and the plank fence did not obstruct the easement just because the Pavans asserted in their objection to the statement of decision that they *did* obstruct the easement.

In summary, the Pavans have not made even the slightest showing that there is a reasonable probability they would have obtained a better result if the assigned judge had considered their objections to his statement of decision before the presiding judge signed the judgment based on that document. In the absence of any such showing, any error in the statement of decision process was harmless.

## II

### *The Owners' Appeal*

For their part, the owners purport to appeal from two orders: (1) the order denying their postjudgment motion for attorney fees; and (2) the order denying their motion for new trial/motion to vacate, by which they sought to "vacate [the] order denying [their]

26

motion for attorney's fees on grounds of lack of jurisdiction." An order denying a new trial motion is not appealable. (*Armenta v. Churchill* (1954) 42 Cal.2d 448, 451.) Likewise, we have no appellate jurisdiction over an attempted direct appeal from an order denying a motion to vacate under section 663. (*Pitino-Capasso F. Co. v. Hillside P. Co.* (1928) 90 Cal.App. 191, 191-192.) Accordingly, the owners' appeal from the order denying their motion for new trial/motion to vacate must be dismissed. That leaves their appeal from the denial of their motion for attorney fees. As we will explain, we find no error in the denial of that motion.

A

*Jurisdiction To Deny Fee Award*

The owners first contend that the presiding judge lacked jurisdiction to deny their motion for a fee award because the assigned judge had already determined that they were entitled to such an award, that determination was made part of the judgment, and the only thing that remained to be done was to determine the amount of fees the owners were entitled to recover. According to the owners, by denying them a fee award, the presiding judge altered the judgment, which the court did not have the power to do.

The owners' jurisdiction argument rests on the proposition that the assigned judge had determined already that they were entitled to an award of attorney fees when he included in his statement of decision a provision stating that "JUDGMENT shall enter in favor of the [owners] and against the [Pavans] as follows: [¶] . . . [¶] 4. For attorney's fees and costs according to proof."[10] The owners contend that "under no reasonable interpretation could 'according to proof' be considered to apply to the entitlement to attorneys' fees and costs rather than simply the amount in the case" because the word "proof" "is consistent with a relationship regarding demonstrable evidence of a thing

_____

[10]    Pursuant to the assigned judge's direction, this language was included in the judgment.

27

(such as the amount of attorneys' fees billed) and <u>not</u> a determination of a legal premise (such as entitlement to fees)."

We are not persuaded. The owners' argument rests on what they admit is only part of the definition of "proof" in Black's Law Dictionary: " 'the establishment or refutation of an alleged fact by evidence.' " In fact, however, "proof" also has a much broader meaning: "Proof is the logically sufficient reason for assenting to the truth of a proposition advanced. In its juridical sense it is a term of wide import, and comprehends everything that may be adduced at a trial, within the legal rules, for the purpose of producing conviction in the mind of judge or jury, aside from mere argument . . . ." (Black's Law Dict. (5th ed. 1979) p. 1094.)

In this broad sense, "proof" can easily be understood to encompass any evidence adduced to convince the trial court to make a fee award, and not just evidence of fees actually incurred by the prevailing party. Thus, in this case, where the owners contended they were entitled to a fee award under the private attorney general theory of section 1021.5, the assigned judge's determination that the owners were entitled to a judgment "[f]or attorney's fees and costs according to proof" can easily be understood as providing for such an award *subject to proof* by the owners that they satisfied the prerequisites for a fee award under that statute.

That this is what the assigned judge meant is bolstered by several factors. First, as the presiding judge observed in denying the owners' motion for fees, section 1021.5 "is not mentioned in the [statement of decision], or argued in [the owners'] Trial Brief, Closing Brief, or Rebuttal brief." It strains credulity to believe that the assigned judge would have determined that the owners were entitled to a fee award under section 1021.5 without the owners ever having argued why such an award was appropriate and without the assigned judge having explicitly evaluated whether such an award was appropriate.

Second, section 1021.5 expressly provides that a fee award under that statute may be made "[u]pon motion." Such motions are traditionally -- and logically -- made *after*

28

the judgment has been entered (in some cases, even after the judgment has become final) "because section 1021.5 'requires the claimant to show that the principal action "has resulted" in the enforcement of an important right and that a significant benefit "has been conferred" ' [citation], [and] that showing often 'cannot be made until the benefit is secure.' " (*Citizens Against Rent Control v. City of Berkeley* (1986) 181 Cal.App.3d 213, 226.) Given this, it again strains credulity to believe that the assigned judge would have determined that the owners were entitled to a fee award under section 1021.5 at the same time he was determining they were entitled to prevail in their action, without any motion for such an award ever having been made.

Under these circumstances, we have no difficulty in agreeing with the presiding judge that the assigned judge did *not* determine that the owners were entitled to a fee award; instead, the assigned judge's determination that the owners were entitled to a judgment "[f]or attorney's fees and costs according to proof" meant only that the owners were entitled to file a postjudgment motion to establish their right to a fee award, and the amount of that award if they proved their entitlement to such an award. Accordingly, the owners are wrong in asserting that the presiding judge lacked jurisdiction to deny their fee motion.

From the foregoing conclusion, it also follows that the owners are wrong in asserting that the presiding judge lacked jurisdiction because the Pavans had already appealed from the judgment before the presiding judge ruled on the fee motion. Like their other jurisdictional argument, this argument rests on the premise that the judgment included an award of attorney fees to the owners. We have rejected that premise. Accordingly, even on this alternate basis, the owners are wrong in asserting that the presiding judge lacked jurisdiction to deny their fee motion.

29

B

*Waiver Of Objections To A Fee Award*

The owners next contend the Pavans waived any objections to the assigned judge's award of attorney fees because the Pavans did not object to the inclusion of a fee award in the statement of decision and did not object to the inclusion of a fee award in the two proposed judgments that circulated after the trial judge issued his statement of decision. This argument is without merit for the same reason as the owners' jurisdictional arguments -- because (as we have explained already) the assigned judge *did not make a fee award* to the owners in his statement of decision, and the judgment did not make such an award either. Because there was no determination that the owners were entitled to a fee award, there was nothing for the Pavans to object to. It was only when the owners actually filed their postjudgment motion for attorney fees that the Pavans were obligated to object by filing an opposition to that motion, which they did. Thus, the presiding judge correctly ruled that the Pavans "did not waive [their] right [to challenge a fee award to the owners] during the process of finalizing the statement of decision and judgment."

C

*Denial Of Private Attorney General Fees*

The owners contend that even if the assigned judge did not determine that they were entitled to a fee award, the presiding judge erred in denying them a fee award under section 1021.5. We disagree.

"Section 1021.5 codifies the 'private attorney general doctrine' adopted by our Supreme Court in *Serrano v. Priest* (1977) 20 Cal.3d 25 [141 Cal.Rptr. 315, 569 P.2d 1303]. [Citations.] The doctrine is designed to encourage private enforcement of important public rights and to ensure aggrieved citizens access to the judicial process where statutory or constitutional rights have been violated. [Citation.] In determining whether to award attorney fees under section 1021.5 to the 'successful party,' we apply a three-prong test inquiring whether (1) the litigation resulted in the enforcement of an

30

important right affecting the public interest, (2) a significant benefit has been conferred on the general public or a large class of individuals, and (3) the necessity and financial burden of private enforcement renders the award appropriate. [Citations.] Regarding the nature of the public right, it must be important and cannot involve trivial or peripheral public policies. The significance of the benefit conferred is determined from a realistic assessment of all the relevant surrounding circumstances. As to the necessity and financial burden of private enforcement, an award is appropriate where the cost of the legal victory transcends the claimant's personal interest; in other words, where the burden of pursuing the litigation is out of proportion to the plaintiff's individual stake in the matter." (*Ryan v. California Interscholastic Federation* (2001) 94 Cal.App.4th 1033, 1044.) To justify an award of attorney fees under the "private attorney general" theory, the plaintiffs must establish that the public benefit achieved by the action was "disproportionately important and valuable in comparison to" any personal benefit the plaintiffs achieved for themselves. (*County of Inyo v. City of Los Angeles* (1978) 78 Cal.App.3d 82, 90.)

"The decision whether the claimant has met his burden of proving each of these prerequisites and is thus entitled to an award of attorney fees under section 1021.5 rests within the sound discretion of the trial court and that discretion shall not be disturbed on appeal absent a clear abuse. [Citations.] In other words, an attorney fees award under section 1021.5 [or, as here, the denial of such an award,] will only be reversed where ' "it is clearly wrong or has no reasonable basis." ' " (*Ryan v. California Interscholastic Federation*, *supra*, 94 Cal.App.4th at p. 1044.)

Here, the presiding judge concluded "that [the owners'] private enforcement of the [offer of dedication] was not necessary because the City's defense of the public's interest in the [offer of dedication] was complete, and sufficient to protect the [owners'] interests as members of the public." The presiding judge also concluded "that the private benefits of the [owners'] action outweighed the public benefits, so the costs they incurred to

31

enforce the [offer of dedication] were proportionate to the private benefit that they would gain from the action." To prevail on appeal, the owners must persuade us that the presiding judge was clearly wrong in reaching these conclusions. They have not done so.

For our purposes, it is sufficient to address only the first conclusion: that private enforcement was not necessary under the circumstances presented. On this point, the owners argue in their opening brief only that "[p]rivate enforcement of the [offer of dedication] was necessary since the Citrus Heights Fire Department had refused to service Jurgens Lane" and "[t]he City did not become involved in this litigation until well after the Owners had filed their actions and even then it was only involved because it was named as a defendant by the Pavans." This argument is not persuasive. The presiding judge specifically noted that the owners filed their initial complaint against the Pavans on November 19, 2007, and that the city became involved in the matter only a short time later when, on December 13, 2007, the city "adopted a resolution which accepted the [offer of dedication], and thus converted it into the City's Easement." The presiding judge then went on to observe that the city "filed its Cross-Complaint to protect the [public easement] on February 21, 2008," and she ultimately concluded there was no evidence "that the City was not taking any action to protect its [easement] once it became aware of the Pavans' contrary position." The owners offer no argument in their opening brief in response to these conclusions, and they point to no substantive litigation that occurred in the matter between the time they filed their complaint in November 2007 and the city filed its cross-complaint in February 2008. Nor do the owners make any attempt to show in their opening brief that their efforts *after* February 2008 were necessary to the ultimate preservation of the public easement. In their reply brief, the owners do offer three pages of argument as to why their efforts in the case were not merely duplicative of the city's efforts. We decline to address those arguments, however, as they come too late. (See *Holmes v. Petrovich Development Co. LLC* (2011) 191 Cal.App.4th 1047, 1074 [arguments raised for the first time in a reply brief are forfeited].)

32

For the foregoing reasons, the owners have failed to show any abuse of discretion in the denial of their motion for section 1021.5 fees.

### DISPOSITION

The owners' appeal from the order denying their motion for new trial/motion to vacate is dismissed. The judgment and the order denying the owners' motion for attorney fees are affirmed.

All parties shall bear their own costs, except that the City of Citrus Heights shall recover its costs from the Pavans. (Cal. Rules of Court, rule 8.278(a)(3).)


                 ROBIE           , J.


We concur:


      RAYE           , P. J.


      BLEASE        , J.